## State of Vermont v. Jason Mears

[749 A.2d 600]

No. 98-252

Present: **Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.**

Opinion Filed January 28, 2000

*James D. McKnight,* Orange County State's Attorney, and *Pamela Hall Johnson,* Deputy State's Attorney, Specially Assigned, Chelsea, for Plaintiff-Appellee.

*Robert Appel,* Defender General, and *Anna Saxman,* Appellate Attorney, Montpelier, for Defendant-Appellant.

**Amestoy, C.J.** Defendant Jason Mears appeals his Orange District Court conviction for attempted murder in the first degree. Defendant argues that (1) the trial court erroneously admitted statements he made to police, (2) he did not waive his rights to silence and to counsel knowingly, intelligently, and voluntarily, and (3) the court should have granted his motion for a mistrial because a prosecution witness's testimony prejudiced defendant. We affirm.

## I. Facts

The relevant facts are not in dispute. Briefly stated, on October 7, 1996, defendant, armed with a revolver, entered neighbor Yvonne Campbell's Braintree home and brutally assaulted her, leaving her for dead. He initially pled guilty to attempted second-degree murder, but then withdrew his plea. At trial, defendant did not contest that he committed the attack, but presented a diminished-capacity defense, claiming that he intended only to steal from the Campbells but raged out of control when his plan went awry. Defendant was convicted of attempted first-degree murder in March 1998.

Because defendant's first claim of error relates to statements made by defendant after he was taken into custody, we briefly recount the circumstances. At approximately 9:30 a.m. on October 7, 1996, Ms. Campell called 9-1-1 and, speaking in a whispered and panicked voice, told the dispatcher that defendant had stabbed her. A half-hour later, an emergency medical team arrived at the scene of the attack. Although bleeding profusely from gaping wounds in her head, neck, and leg, Ms. Campbell was conscious and again identified defendant as her attacker.

Shortly after 1:00 p.m. on the same day, police took the then seventeen-year-old defendant to the Vermont State Police barracks in

Bethel. Defendant was reluctant to call his father, but did so at the insistence of Officer Terry Lewis. Defendant's father, Bruce Mears, arrived at the barracks at approximately 3:30 p.m. During the two hours defendant was at the barracks without his father, he was not questioned. He was allowed from time to time to walk outside and smoke. Upon his arrival at the barracks, Mr. Mears was informed by Officer Lewis that his son was a suspect in a stabbing at the Campbell residence, that the police needed to interview defendant, and that Mr. Mears could talk privately with his son in one of the interview rooms and decide whether they wanted to talk to the police.

Mr. Mears and defendant went into the private room and, after an unspecified period of time, Mr. Mears emerged from the room and told Officer Lewis: "We'll talk to you." Officer Lewis responded that questioning would not begin until Detective Gloria Danforth returned to the barracks because she was to conduct the interview. Detective Danforth, who had talked extensively with Ms. Campbell when the victim called 9-1-1 to report the attack, was at the Mears residence conducting a search pursuant to a valid warrant. Detective Danforth's arrival was delayed about two hours, during which time defendant, Mr. Mears, and defendant's mother, Naomi Mears, who had arrived after Mr. Mears, went in and out of a private interview room.

At approximately 5:30 p.m., Detective Danforth arrived at the barracks, at which time defendant and his parents were outside smoking. Detective Danforth told Mr. Mears, out of defendant's presence, that she wanted to question his son but that, because defendant was only seventeen years old, she needed parental permission. Detective Danforth ensured that Mr. Mears understood that he did not have to give such permission, but Mr. Mears responded that he felt that it was very important to prove his son's innocence, that he and defendant had discussed at great length the kinds of questions that would be asked, and that he had no problem with the interview. Following this conversation, Detective Danforth and Mr. Mears rejoined defendant and Mrs. Mears, where she informed them that there was a search warrant being served at their residence. Mrs. Mears went home to be present during the search.

Detective Danforth met with Mr. Mears and defendant in a barracks interview room, where she advised both of them of all *Miranda* warnings, ascertained that they understood their rights, and recorded their responses on a written form. She then stated that she was legally obligated to leave the room to give Mr. Mears and defendant a private opportunity to discuss whether they wanted to

sign a *Miranda* waiver and agree to the interview. As Detective Danforth got up to leave the room, Mr. Mears told her that it was not necessary for her to leave and indicated that they wished to waive the rights and speak with her. Detective Danforth remained in the room, and both Mr. Mears and defendant signed the waiver.

Detective Danforth, Mr. Mears, and defendant engaged in a three-way conversation in which defendant and Mr. Mears expressed hatred for the Campbells, especially Ms. Campbell, whom they suspected had reported them for violating local ordinances. Defendant then stated that he felt that the police were always picking on him, as he had previously been questioned by Randolph police for unrelated minor violations. Defendant denied ever being at the Campbell residence or meeting Ms. Campbell and shrugged his shoulders when Detective Danforth asked him why Ms. Campbell would have identified him as her attacker if he had never been there.

When Detective Danforth questioned defendant about blood found on a firearm seized from the Mears home, he started quivering, hung his head, and stated that he wanted to tell her the whole story. Detective Danforth asked defendant if she could tape record his statement, but defendant requested that she write his statement instead. At this point, Mr. Mears intervened, stating that he did not want Detective Danforth to ask defendant any more questions. Defendant and his father then began shouting at one another about hiring a lawyer for defendant, and defendant berated himself several times. The exchange between defendant and Mr. Mears escalated in tension, and Detective Danforth attempted to defuse the situation, asking defendant what she could do for him. Defendant responded by requesting Detective Danforth give him her gun and he would shoot himself. Defendant continued to talk of killing himself and was eventually taken to a holding cell. Detective Danforth learned that the crime scene investigators had not located defendant's clothing or the knife used in the attack, and that the police were planning to secure the Mears home until morning so they could search the exterior in daylight. Detective Danforth asked Mr. Mears if he would ask defendant where these items were so that the Mears family could return to their home that night. Mr. Mears spoke privately with defendant, then told Detective Danforth that defendant did not want to talk to her and that she would never find the items because defendant had thrown them in a brook.

At trial, a jury found defendant guilty of attempted first-degree murder, and the court sentenced him to thirty-five years to life

imprisonment. Defendant appeals, arguing that: (1) the court erroneously admitted statements he made to Detective Danforth before Mr. Mears terminated the interview at the Bethel barracks; (2) he did not waive his rights to silence and to counsel knowingly, intelligently, and voluntarily; and (3) the court should have granted his motion for a mistrial because a prosecution witness's testimony prejudiced defendant.

## II. Discussion

### A. Admission of Defendant's Statements

In response to defendant's motion to suppress all statements he made to Detective Danforth, the court suppressed statements made after Mr. Mears terminated the interrogation "including, but not limited to those prompted by question about the defendant's well[-]being or about where he hid evidence." However, the court ruled that all statements made prior to that termination were voluntary and admissible. Defendant claims that the court erroneously admitted these statements in violation of our decision in *In re E.T.C.*, 141 Vt. 375, 449 A.2d 937 (1982).

In *E.T.C.*, we held that, for a waiver of a juvenile's rights against self-incrimination and to counsel under Chapter I, Article 10 of the Vermont Constitution to be voluntary and intelligent, the following criteria must be met:

> (1) he must be given the opportunity to consult with an adult; (2) that adult must be one who is not only genuinely interested in the welfare of the juvenile but completely independent from and disassociated with the prosecution, e.g., a parent, legal guardian, or attorney representing the juvenile; and (3) the independent interested adult must be informed and be aware of the rights guaranteed to the juvenile.

*Id.* at 379, 449 A.2d at 940. Defendant argues that the court's admission of defendant's statements to Detective Danforth was error because (1) there was no "meaningful consultation" between defendant and Mr. Mears, *id.*, and (2) Mr. Mears could not waive defendant's rights for him.

The first argument fails because Detective Danforth provided the opportunity for Mr. Mears to meet with defendant "in the absence of police pressures." *Id.* at 380, 449 A.2d at 940. This meets *E.T.C.*'s

requirement that "[a] private consultation should be provided." *Id.* Moreover, Mr. Mears — defendant's father — is an adult who is "genuinely interested in the welfare of the juvenile but completely independent from and disassociated with the prosecution." *Id.* at 379, 449 A.2d at 940. The opportunity to meet with an "independent, impartial, responsible, interested adult[,]" *id.* at 380, 449 A.2d at 940, outside the atmosphere of the interrogation room satisfies *E.T.C.*'s "meaningful consultation" requirement.[1] *Id.* at 379, 449 A.2d at 940. That opportunity was provided here, and defendant's failure to take advantage of it does not render Detective Danforth's subsequent interrogation violative of *E.T.C.*

Defendant's second argument — that Mr. Mears could not waive defendant's rights for him — was not preserved at trial. Thus, we review this argument only for plain error. See V.R.Cr.P. 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."). We stated the relevant standard in *State v. Pelican*:

> Plain error exists "only in exceptional circumstances where a failure to recognize error would result in a miscarriage of justice, or where there is glaring error so grave and serious that it strikes at the very heart of the defendant's constitutional rights." Plain error doctrine requires "an appellate court to find that the claimed error not only seriously affected 'substantial rights,' but that it had an unfair prejudicial impact on the jury's deliberations." Prejudice must exist to demonstrate that error undermined fairness and contributed to a miscarriage of justice.

160 Vt. 536, 538-39, 632 A.2d 24, 26 (1993) (citations omitted).

Defendant argues that the admitted statements were prejudicial because they showed that defendant hated Ms. Campbell and provided a motive for the attack, thereby rebutting his "primitive rage reaction" defense. Nevertheless, the State presented overwhelming evidence demonstrating defendant's hatred for the victim beyond the contested statements. Included in this evidence was Ms. Campbell's testimony that during the vicious attack defendant repeatedly told

---

[1] Further strengthening this conclusion is the fact that, prior to offering the private consultation, Detective Danforth advised both Mr. Mears and defendant of all *Miranda* warnings and ascertained from them that they understood their rights, leaving no doubt that defendant's father was "informed and . . . aware of the rights guaranteed to the juvenile." *E.T.C.*, 141 Vt. at 379, 449 A.2d at 940.

her that he hated her. Detective Danforth also testified that, when Ms. Campbell recounted the attack in her 9-1-1 call, she reported defendant's repeated statements of hatred towards her. Yet another prosecution witness, Dr. Janice Peyser, testified that defendant told her that he was angry with Ms. Campbell and seemed to hold a grudge against her because her cat had scratched his car.

■ This testimony provided an adequate foundation for the jury to weigh the prosecution's contention that this was a planned or deliberated assault motivated by defendant's hatred for Ms. Campbell, against defendant's primitive-rage-reaction defense. Thus, defendant has failed to demonstrate that the court's admission of his statements to Detective Danforth was plain error that "not only seriously affected 'substantial rights,'" but also "undermined fairness and contributed to a miscarriage of justice." *Pelican*, 160 Vt. at 539, 632 A.2d at 26.[2]

### B. Defendant's Waiver

Defendant next argues that his waiver of his right to silence and to counsel rights was not knowing, intelligent, or voluntary. Specifically, defendant argues that the court did not conduct a "probing inquiry" to determine whether defendant knowingly and intelligently waived his rights, as is required to protect the rights of persons with diminished mental capacity or lower intelligence. *State v. Cleary*, 161 Vt. 403, 413, 641 A.2d 102, 108 (1994).

Again, however, defendant did not raise these issues at trial; thus, we review only for plain error. See V.R.Cr.P. 52(b). Defendant did not put the court on notice that he had a serious mental impairment that interfered with his ability to knowingly and intelligently waive his rights. The record shows that defendant made only limited references to his mental impairment with regard to waiver, despite the fact that he put on substantial evidence of his diminished capacity to control his rage in the attack, including the testimony of an expert on defendant's stunted frontal lobe development. Defense counsel never argued that

---

[2]Defendant's brief selectively quotes from the prosecutor's closing arguments to support his argument that the State heavily stressed Detective Danforth's testimony to establish that defendant hated Ms. Campbell. While it is true that the prosecutor discussed defendant's statements from the interview with Detective Danforth, this was only part of the prosecutor's overall argument that recounted all of the evidence — including Ms. Campbell's testimony that defendant told her he hated her — which showed that defendant hated the victim and thus had a motive for the attack.

defendant could not make a knowing, intelligent, and voluntary waiver of his rights.

Although the issue was not raised below, the court entered substantial findings on defendant's capacity to waive his rights:

> Officer Danforth took Bruce and Jason into the interrogation room where she read the *Miranda* rights and Public Defender Forms. After each question, she received a positive response from each Mears and noted each on the form.
>
> . . . .
>
> When advising them that they could stop the questioning at any time, she read the passage twice and each acknowledged that they understood, and the acknowledgment was recorded.
>
> . . . .
>
> The *Miranda* and Public Defender rights were properly read and explained to both Mears. Both understood Jason's rights and Jason, with the advice and guidance of his father and his approval, voluntarily waived those rights.
>
> . . . .
>
> Jason, though technically a minor, was less than a year away from majority. He had been questioned by police on at least two other occasions, understood his criminal rights and indeed, without advice, exercised his right against a warrantless search just hours before.[3] He had already spent almost two hours discussing his predicament with his father. His waiver was voluntary, as were the statements he made to Detective Danforth up until his father invoked his right to have questioning cease.

Thus, the court inquired and then found that defendant was capable of waiving his rights. Moreover, the court personally addressed defendant to ascertain his reasons for changing his plea to not guilty and to ensure that he understood the consequences of his withdrawal. In response to the court's inquiry of why defendant was

---

[3] Defendant had been questioned by Randolph police months earlier for his possible involvement in minor violations. He also refused to allow police officers to search the Mears home when they were investigating the crime on the morning of the attack. Defendant expressly asked whether the officers had a search warrant.

changing his plea, defendant answered that he had not completely understood his original plea and had felt pressured into entering it. As the court questioned him further, defendant indicated a similar degree of understanding sufficient to establish a knowing, intelligent, and voluntary waiver. If there was any error here, it certainly did not rise to the level of plain error. See *State v. Forant*, 168 Vt. 217, 220, 719 A.2d 399, 401 (1998) ("Plain error exists only in extraordinary situations where it is 'obvious and strikes at the heart of defendant's constitutional rights or results in a miscarriage of justice.'") (quoting *State v. Streich*, 163 Vt. 331, 353, 658 A.2d 38, 53 (1995).

## C. Denial of Defendant's Mistrial Motion

Finally, defendant argues that the court erred in denying his motion for a mistrial following Detective Danforth's testimony that she believed that some of defendant's statements from the October 7 Bethel barracks interview had been suppressed. As discussed previously, the court allowed defendant's statements prior to Mr. Mears' invocation of defendant's right to silence, but suppressed all statements after the father's invocation. At trial, however, the following colloquy between Detective Danforth and defense counsel took place during cross-examination:

> Defense Counsel: [Defendant] continued to tell you that he wanted to kill himself by using a gun to his head, right?
>
> Detective Danforth: That's correct.
>
> Q: And this is during the time period when you are trying to interview this person, right?
>
> A: Yes.
>
> Q: And once you had confronted him with the evidence that you knew that you had he became more upset about it, right?
>
> A: Yes, he did.
>
> Q: He kept telling you that he just wanted to kill himself?
>
> A: I believe those statements have been suppressed.

Defense counsel objected to Detective Danforth's testimony that certain statements had been suppressed. At a bench conference, defendant moved for a mistrial on the grounds that the testimony

revealed to the jury that statements had been suppressed and indicated that defendant was hiding information from their consideration. The court denied the mistrial motion, but gave this curative instruction — which met with defendant's approval — to the jury:

> The last statement that the officer made should be disregarded.

> Let me give you a little explanation about suppression, so that you are not left with the impression that we are withholding anything from you that you should be considering.

> I have previously ruled that when Mr. Mears, acting as guardian for Jason, told Officer Danforth that Jason would no longer talk to her, a statement that Jason made in the brief period of time that they were all together thereafter was not to [be admitted as] evidence in the trial.

> Now, Officer Danforth thought that the question Mr. Griffin asked referred to that statement. And that was not Mr. Griffin's intention and he will ask another question.

> You are instructed to disregard both the question that Mr. Griffin asked and the answer that Officer Danforth gave, the last question and the last answer only. And you are further instructed not to speculate regarding any matter that I have ruled not in evidence in this case.

■■ Defendant now contends that the court erred in denying his mistrial motion, and that he suffered prejudice as a result of Detective Danforth's testimony. The court has discretion in ruling on a mistrial motion, "but should not grant the motion unless the moving party establishes prejudice." *State v. Jones*, 160 Vt. 440, 449, 631 A.2d 840, 847 (1993). We will uphold the court's ruling "unless the court's discretion was either totally withheld or exercised on grounds clearly untenable or unreasonable." *State v. Roberts*, 154 Vt. 59, 73, 574 A.2d 1248, 1255 (1990).

■ In determining whether a defendant has suffered prejudice, we examine the totality of the circumstances, considering the testimony within the context of the entire proceedings. See *State v. Covell*, 142 Vt. 197, 199, 453 A.2d 1118, 1119 (1982). Here, the State presented testimonial and physical evidence that overwhelmingly established that defendant was the assailant. Indeed, as defendant states on

appeal, "the defense did not contest the attack or its brutality." Furthermore, as the trial court noted in a bench conference with defense counsel, the counsel's cross-examination questions "elicited a response that you have to, in part, be responsible for." Finally, the court's "immediate and unequivocal" curative instruction was sufficient to cure any potential prejudice. *State v. LaBounty*, 168 Vt. 129, 140, 716 A.2d 1, 8 (1998). Thus, any possible prejudice visited upon defendant was minimal. The court was in the best position to evaluate the prejudicial effect of a response induced by defendant's cross-examination, and it committed no error in denying defendant's mistrial motion. See *Jones*, 160 Vt. at 449, 631 A.2d at 847. Moreover, defense counsel expressly declined to object after the court read the instruction; thus, defendant "has failed to preserve the issue he now raises for appellate review." *State v. Calloway*, 157 Vt. 217, 219, 596 A.2d 368, 370 (1991). Our review reveals no plain error in the court's action here. See *id*.

*Affirmed.*