## Stephanie Needham, b/n/f Marilee and James Needham, and Marilee and James Needham, Individually v. Coordinated Apparel Group, Inc., et al.

[811 A.2d 124]

No. 99-360

Present: **Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.**

Opinion Filed June 28, 2002
Motion for Reargument Denied October 7, 2002

*Robert B. Hemley, Norman Williams* and *Rebecca C. Raskin* of *Gravel and Shea,* Burlington, for Plaintiffs-Appellees.

*Robert D. Rachlin* and *Christopher D. Roy* of *Downs Rachlin & Martin, PLLC,* Burlington, and *Michael J. Goldman* of *Hawkins & Parnell, LLP* (Of Counsel), Atlanta, Georgia, for Defendants-Appellants.

**Dooley, J.** Defendants, comprised of the manufacturers, distributors and retailers of a cotton garment that ignited, injuring Stephanie Needham, appeal from a judgment based on a jury verdict in favor of plaintiffs, Stephanie and her parents, on their negligence, breach of warranty and products liability claims. Defendants contend the court erroneously: (1) denied their motion for judgment as a matter of law because the evidence established that the accident could not have happened as plaintiffs contended, and did not support their failure-to-warn products liability claim; (2) admitted a Congressional subcommittee hearing report; and (3) denied a motion for mistrial following plaintiffs' closing argument. We reject the first contention, but agree with the second, and therefore reverse and remand for a new trial.[1]

Construed in the light most favorable to the judgment, see *Haynes v. Golub Corp.*, 166 Vt. 228, 233, 692 A.2d 377, 380 (1997), the main evidence presented to the jury was as follows. On the morning of January 10, 1995, while she was "lean[ing] up against the chair that is in front of the [wood] stove to watch television," Stephanie Needham's cotton turtleneck suddenly burst into flame. Stephanie, her brother and her parents testified that at the time of the incident the door to the wood stove was closed and there were no open flames or sparks. Stephanie recalled that she "heard a whooshing sound ... then I turned my head and saw the flames." She immediately ran outside and rolled in the snow. After she stood up, however, the shirt reignited. Stephanie's brother then threw her to the ground and extinguished the flames.

The Hearthstone stove in question had a front window and a loading door on the left side which could be opened only with a special tool. Stephanie was not permitted to open the stove door, and had never done so. She had been "told not to sit on the hearth," and the chair which she leaned against at the time her shirt ignited was located approximately three feet from the stove.

Plaintiffs' expert, Dr. Charles Beroes, testified about how a cotton garment could ignite in the absence of an open flame:

> When cotton is heated, it begins to decompose into ... pyrolysis gas. ... These gases are highly flammable ... [and] are generated at low temperatures, 380 degrees ... depending upon what's on the fabric. There may be polymers

---

[1] We grant appellees' motion to file a surreply brief and deny appellants' motion to strike the surreply brief.

or plastics ... and dyes.... [T]he spontaneous ignition temperature is that at which the gases will ignite without any outside assistance, no energy from the outside, no spark, no match, no flame. They will ignite spontaneously ... automatically when one reaches temperatures like 875 degrees.

Dr. Beroes also offered an explanation as to how the turtleneck could have ignited without Stephanie feeling excessive heat:

It was very cold that morning, 10 to 20 degrees below zero and she was trying to keep warm. The back of her ... turtleneck was hanging. The importance of this is she wouldn't sense heating of that lower part of the undershirt and its gasification and so on because it wasn't in contact with her skin.... [T]he shirt became heated to 380 degrees ... and [began] to pyrolyze profusely.... Now, while this is going on ... chimneys we all know have a draft ... drawing in air from the surrounding environment and now some of this vapor becomes heated sufficiently to its spontaneous ignition temperature, that is 875 degrees.

The evidence showed that cotton was combustible and had "hidden unknown danger[s]." Specifically, evidence showed that cotton garments are self-propagating, or not self-extinguishing, so that they will continue to burn after the source of ignition is removed, and that "there is a very rapid flame spread."

Stephanie received first, second and third degree burns across 18 – 20 percent of the surface of her skin, requiring extensive medical intervention to induce healing and reduce scarring. The incident also had a significant psychological impact on Stephanie; she experienced nightmares and was diagnosed with post-traumatic stress disorder and a body image disturbance, both of which interfered with her normal activities.

The garment that ignited was in full compliance with all applicable federal and industry flammability standards.[2] Ordinary clothing of the type in question rarely includes flammability warnings. The published ignition temperature for cotton is 752 degrees Fahrenheit.

Plaintiffs filed suit in Addison Superior Court against the manufacturers, distributors and retailers of the cotton turtleneck,

---

[2] Commercial Standard 191-53, 16 C.F.R. pt. 1610, has been the federal flammability testing standard since 1953.

asserting theories of strict liability, negligence and breach of warranty. After a five-day trial, the jury returned a verdict in favor of plaintiff Stephanie Needham finding defendants were negligent and breached their warranty and that they were strictly liable in tort. They awarded damages in the amount of $3 million, but reduced that amount by 50% to reflect their finding of her proportionate fault. As to the parents' claims, the jury concluded that they were 75% at fault and therefore found for defendants. Defendants moved for judgment notwithstanding the verdict, and in the alternative for a new trial. Both motions were denied. This appeal followed.

We first consider defendants' contention that the court should have granted their motions for judgment as a matter of law because acceptance of that contention would end this litigation. The trial court denied these motions because it found that Dr. Beroes testimony provided "sufficient evidence to get the case to the jury."

Defendants renew their claim on appeal that the evidence was insufficient to support any theory of how the accident happened that would give rise to their liability. We review motions for judgment as a matter of law to determine "whether the result reached by the jury is sound in law on the evidence produced." *Brueckner v. Norwich University*, 169 Vt. 118, 122, 730 A.2d 1086, 1090 (1999) (internal citations omitted). "If evidence exists that may fairly and reasonably support all elements of the nonmoving party's claim, judgment as a matter of law is improper." *Id.* "We view the evidence in the light most favorable to the nonmoving party and exclude the effect of any modifying evidence." *Haynes*, 166 Vt. at 233, 692 A.2d at 380.

Defendants' argument is based on their view that the evidence supports only two possible ways in which the accident occurred: (a) the turtleneck came in contact with the fire in the stove or (b) because of proximity to the stove, the temperature of the turtleneck reached 800 degrees Fahrenheit. They characterize the second possibility as incredible because plaintiff would have felt the heat before the fire started. They submit that the first possibility is what really occurred, but that such contact represents product misuse and controlling negligence as a matter of law.

We do not have to get into the underlying law to reject this argument. The problem with it is that plaintiffs' expert witness presented a third theory which does not have the deficiencies that defendants cite. The expert's theory was that the lower part of the turtleneck, which did not touch plaintiff's skin, reached 380 degrees Fahrenheit and emitted pyrolysis gases. Those gases were sucked

down to the stove by the air intake system and ignited when they came in contact with the stove. They, in turn, ignited the turtleneck. As the trial court held, this theory was sufficient to support the jury verdict.

Defendants next argue that judgment as a matter of law should have been granted on plaintiffs' failure-to-warn claim. We note at the outset that this is only one of the theories underlying the jury verdict. See *Lorrain v. Ryan*, 160 Vt. 202, 209, 628 A.2d 543, 548 (1993) (where verdict rests on multiple theories appellant must show error with respect to all theories). In any event, we find no error in the rejection of the motion.

The applicable law is set out in *Webb v. Navistar International Transportation Corp.*, 166 Vt. 119, 127, 692 A.2d 343, 347 (1996):

> A manufacturer also has a duty to warn users and consumers when it knows or has reason to know of dangers inherent in the product at the time the product is sold, or when the product is dangerous to an extent beyond that which would be contemplated by an ordinary consumer. To establish strict liability for an inadequate warning, a plaintiff must prove that the inadequate warning made the product unreasonably dangerous and was the proximate cause of the injury.

(citations omitted). See *Town of Bridport v. Sterling Clark Lurton Corp.*, 166 Vt. 304, 307-08, 693 A.2d 701, 704 (1997). Again, the testimony of plaintiffs' expert witness supported the need to warn of the flammability of the cotton turtleneck, and specifically the explosive nature of the fire and the rapid spreading of the flames. Defendants argue that they were not required to warn of patent and obvious dangers, see *Menard v. Newhall*, 135 Vt. 53, 55, 373 A.2d 505, 507 (1977), and the dangers of cloth being ignited by excessive heat or flame falls in that category. Again, we believe that defendants are warring with the facts before the jury. The fact that a cotton turtleneck could ignite without warning when its wearer stands three feet from a wood stove could be found to be a latent danger beyond the knowledge of an ordinary consumer.

We are no more persuaded when defendants recast their argument as one of proximate cause and note that because plaintiff was warned not to get close to the stove and ignored the warning, any additional warning would be useless. We recognize a presumption that, if a manufacturer has a duty to warn and fails to discharge the duty, the user would have heeded an adequate warning if it had been given. See

*Town of Bridport*, 166 Vt. at 308, 693 A.2d at 704. In this case, the jury could find that plaintiff heeded the warning her parents had given and, in any event, would have heeded an adequate manufacturer's warning about the events that occurred here. See *id.* at 309-10, 693 A.2d at 704.

Finally, defendants argue that plaintiffs' expert's testimony should not have been admitted under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The problem with this argument is that defendants have changed it between the trial court and this Court. In the trial court, defendants argued that Dr. Beroes's training and experience as a chemical engineer did not qualify him as an expert on the topic of "warning labels for garments in the textile industry," nor on behavioral responses to such warnings. The court found Dr. Beroes qualified to testify regarding the latent flammability characteristics of the garment, and thus whether the garment was unreasonably dangerous and should have carried a warning.

In this Court, defendants advance a different argument: that Dr. Beroes's testimony should have been excluded because it was scientifically unsound under V.R.E. 702 and the standard articulated by the United States Supreme Court in *Daubert*. Because this argument was not made in the trial court, it was not preserved. See *Morais v. Yee*, 162 Vt. 366, 372, 648 A.2d 405, 410 (1994); see also *State v. Valley*, 153 Vt. 380, 398, 571 A.2d 579, 588 (1989) ("On appeal, defendant is bound by the specifics of her objection.").

Defendants next contend that the court erred in admitting a transcript of a Congressional subcommittee hearing dealing with proposed amendments to the federal Flammable Fabrics Act. To understand the nature of the contention, and our ultimate conclusion that the report was not only erroneously admitted, but that its admission compels reversal of the judgment, requires a somewhat detailed description of the contents of the transcript. The transcript is of a hearing held thirty-four years ago by the Consumer Subcommittee of the Senate Commerce Committee on a bill which would have "increase[d] the protection afforded consumers against injurious flammable fabrics." Almost twenty witnesses testified over a three-day period, stating positions on all or part of the bill. Four of the witnesses were representatives of trade organizations for a segment of the apparel industry: The National Cotton Council of America, American Apparel Manufacturers' Association, American Textile Manufacturers' Institute, Inc., and American Retail Federation. The nonindustry witnesses generally sought higher flammability standards

and supported those sections of the proposed bill which they felt would bring about those standards.

In his opening statement, the subcommittee chair, Senator Magnuson, opined that "burns from ignition of clothing and other household fabrics clearly constitute an extremely serious health problem in the United States," and claimed that "[t]housands of men, women, and children are burned, many fatally, when their clothing catches fire." The next witness, an official from the Department of Commerce, asserted that persons in the lowest income brackets suffer more frequently from clothing burns, and that "children, the disabled, and the elderly, are particularly susceptible to burn injury." An official from the Department of Health, Education and Welfare followed with the startling information that "clothing ignition is involved in about 150,000 cases" annually, and underscored that "the most tragic aspect of these fabric burns is that a large proportion claim as their victims those who are least able to help themselves — the aged, the disabled, the poor, our very young children."

This statement was followed, in turn, by a witness actually igniting a piece of cotton cloth to demonstrate that after the flame is extinguished it retains, in the witness's words, "an afterglow that we have been told is much higher [in] temperature than the original." This assertion echoed plaintiffs' theory at trial that cotton garments often reignite after being extinguished. A Special Assistant to the President for Consumer Affairs, Betty Furness, followed with additional statistics underscoring the vast number of clothing fires per year, and urged that "the consumer must be assured that the fabrics he buys are reasonably safe." The chairman of the Federal Trade Commission testified that most injuries and deaths result from articles of clothing that would pass the federal flammability test. A news correspondent described in vivid detail how his eleven-year-old daughter "became the victim of a flaming piece of cotton" which — according to his unimpeached testimony — initially appeared to be extinguished and then somehow reignited — a scenario again reminiscent of plaintiffs' description of the accident in this case. The anguished father concluded:

> I took the remains of Carole's burned blouse to have it tested. I was told that the cotton fabric from which it was made lies within the burning-time [federal] standards. Nothing, in other words, could be done under existing law to prevent another Carole from having to undergo the same torture

from a burn caused by the same or similar fabric. . . . The
public must be made aware of the seriousness of the problem.

Additional witnesses followed, including an officer of the American Trial Lawyers Association (ATLA). This testimony is particularly relevant to the issue before us because it contains the argument why a jury should ignore the fact that a fabric met federal flammability standards. The ATLA witness described a client coming into a lawyer's office because a "child's dress suddenly went up in flames . . . almost spontaneously." According to the witness, if the lawyer is aware of the federal standards, the lawyer will send the fabric of the dress for testing and "almost invariably" find it meets federal standards. At that point, according to the witness, the lawyer will disbelieve the client or go to court, where the manufacturer will offer the "very compelling testimony" that the dress met federal flammability standards, creating an "almost insuperable obstacle in terms of jury psychology." The witness went on to argue:

> But in a real sense the existence of the act has been a deterrent to the lawyer on carrying out the normal therapeutic process of liability litigation, because the lawyer will, in the face of an obstacle he must overcome in the courtroom, tend to either settle the case or postpone it, settle it for a nominal amount, and he does not believe that he has much of an opportunity to overcome the burden that the defendant imposes on him by showing that the article has complied with the standards.
>
> . . . .
>
> Because otherwise, sir, the adoption of these standards which are going to represent and must in our system represent the views of the manufacturer will turn out to be a shield for a delinquent manufacturer rather than an aid to the consumer.
>
> Because we believe that the therapy of a good lawsuit and a good damage recovery — and these damage recoveries in burn cases can be quite substantial — represent a great goal to the manufacturer to accelerate what research they have started in order to develop flame-retardant materials.

The witnesses continued with an orthopaedic surgeon who described the grim circumstances of an incident involving a little girl whose nightgown was ignited by a space heater.

The evidentiary issues that led to the admission of the transcript in this case arose in the context of the parties' dispute over the weight to be accorded the federal standard on the flammability of cotton clothing and the fact that the cotton turtleneck worn by Stephanie Needham met this standard. In their opening statement, defendants stressed the longevity of the standard, and the fact that it had been periodically reviewed by Congress and remained unchanged. Plaintiffs countered that the standard was inadequate and the product of industry pressure. On redirect examination of their key expert witness, Dr. Beroes, plaintiffs' counsel first produced the transcript of the 1967 subcommittee hearings — marked for identification but not yet admitted into evidence — and asked Dr. Beroes whether a representative of the National Cotton Council appeared at the hearings and made certain statements. Defense counsel objected on hearsay grounds, and plaintiffs' counsel responded that the document came within a hearsay exception for ancient documents, V.R.E. 803(16), and would also be offered as part of the basis for Dr. Beroes's opinion. The court allowed the examination, after noting that defendants had elicited testimony about the longevity of the standard and the frequency of reviews of it by government agencies. Dr. Beroes testified that the industry representative stated that the flammability standard lacked precision, but that proposed modifications unfairly promoted other fibers over cotton. He also testified that these statements, as well as those of government officials, were relied upon by him in forming his opinion that the flammability standard was inadequate.

Later, plaintiffs' counsel returned to the subject, asking defendants' expert witness — over objection — whether he was aware that the cotton industry had spent "great time and money" to influence politicians with respect to the flammability standards. When that question did not produce an affirmative response, counsel walked the witness through the testimony of the National Cotton Council representative at the 1967 subcommittee hearing. Following the testimony of defendants' expert witness, counsel offered the transcript of the subcommittee hearings, asserting that the transcript fit within hearsay exceptions in V.R.E. 803(8) (public records) and (16) (ancient documents) and was self-authenticating under V.R.E. 902(5). Over objection, the court admitted the entire transcript.

Defense counsel returned to the issue the next day, and before the transcript was to go to the jury for deliberation, and reiterated that the transcript fit within no hearsay exception and contained extensive

advocacy statements like those summarized above. The court suggested redaction of all but the statement of the industry representative, but plaintiffs' counsel objected to this limitation, saying the document had "good and bad ... for everybody." The court and plaintiffs' counsel then engaged in the following colloquy, which became the ruling of the court:

> THE COURT: If I remember the cross-examination right, Mr. Hemley's point was to try to get Dr. LeBlanc to concede that there are a lot of industry pressures being brought to bear in 1967 when the act was up for reconsideration. And, you know, I think that's a fair point.
>
> But I didn't understand the — the offer to be that what so-and-so witness said was — was true and should be accepted by the jury as true. It was simply to point out that this is a congressional hearing where there are pressures being brought to bear on the politicians. Hardly any surprise there.
>
> MR. HEMLEY: That's precisely correct. I'm not suggesting that any of these statements are or are not true.
>
> THE COURT: And I think because of the limited purpose for which it's being offered I'm going to overrule the objection. But I don't think that — I'm not saying that Mr. Hemley should be waving that document in front of the jury saying look what this guy said back in 1967, that this product is unsafe and, you know, there are "x" number of injuries and so forth. This was not the reason why it was introduced.
>
> So I agree with Mr. Goldman as to the — the details. But the document is in evidence for the limited purpose for which it was offered and I'll expect that you will tailor your argument to reflect that — that limited purpose.

In closing argument, plaintiffs' counsel did precisely what the court prohibited. He argued:

> [Y]ou will have in the jury room Exhibit No. 66 which are the hearings before Congress in 1967 that were — when Congress was considering amending the act to make it more protective of people, the ordinary people like ourselves. And you'll be able to read that to yourselves in the jury room.

One of the things that you'll be able to see is that William Siegel who was head of the Cotton Council of America, the same organization you will remember that Dr. LeBlanc worked for and which promotes the interest of cotton in the United States, when he was testifying before Congress what he said to you, very similar to what Mr. Goldman said to you, is there is a very real danger that stricter standards would promote the use of certain specialized fire resistant fibers at the expense of other fibers which may be more combustible.

Thanks to the effort of Mr. Siegel and other industry spokesmen the standards adopted in 1953 have never been changed *even though according to Betty Furness, some of you may recall whose testimony is also in Exhibit 66, who was then special assistant to President Johnson for consumer affairs, she told the senate committee, which then did not change the law under the influence of these lobbyists, that each year a million people are seriously burned in their homes. 150,000 of these burns are from clothing fires. 2,000 to 3,000 people die each year in clothing fires.*

*Congress heard this compelling testimony from her and from others and ignored it because of the influence of the cotton lobbyists. But one of the great features of this government and of this system is that there will be no cotton lobbyists in the jury room when you retire.*

(Emphasis supplied.) In a later part of the argument, plaintiffs' counsel returned to the exhibit and said that when the jury has a chance to look at it "you'll see that the hearing that took place in 1967 was the first time anybody had even bothered to look at this standard."

We note, at the outset, that the trial court's initial decision to admit the entirety of the Congressional hearing and transcript cannot be sustained under either of the hearsay exceptions advanced by plaintiffs at trial. Rule 803(8) permits the admission of "records, reports, statements, or data compilations in any form of a public office or agency setting forth its regularly conducted and regularly recorded activities ... or factual findings resulting from an investigation made pursuant to authority granted by law." V.R.E. 803(8)(A). The hearsay exception may be sufficient to overcome the first level of hearsay involved in a written government document, but it does not overcome the fact that the statements of witnesses represent a second layer of

hearsay. See *Pearce v. E.F. Hutton Group, Inc.*, 653 F. Supp. 810, 815 (D.D.C. 1987) (equivalent federal exception covers governmental factual findings but not witness testimony at a Congressional hearing); see generally 30B M. Graham, Federal Practice and Procedure: Evidence § 7049, at 476-77 (Interim Edition 2000). For the same reason, the "ancient documents" exception, V.R.E. 803(16), does not apply. The age of the public hearing transcript may overcome the first level of hearsay, but there is no general hearsay exception for "ancient" declarations of witnesses.

■ Nor, finally, does the trial court's ultimate decision to admit the report for the limited purpose of showing that "there are pressures being brought to bear on the politicians" withstand analysis. Even assuming that the document was relevant and admissible for this limited purpose,[3] it was incumbent upon the trial court to exclude those extensive portions which were not only unrelated to this subject, but highly prejudicial to defendants. Confronted with a document partially relevant at best, the trial court was required to exclude it or to require that the irrelevant and objectionable matter within it be redacted. See 1 Wigmore on Evidence § 17, at 787-88 (Tillers rev. 1983) ("If several facts are included in the offer, some admissible and others inadmissible, the whole (if properly objected to) is inadmissible; in other words, it is for the proponent to sever the good and the bad parts."); *State v. Raymond*, 148 Vt. 617, 622, 538 A.2d 164, 167 (1987) (when part of offer is relevant, and part is not relevant, court must admit only the relevant part); *Bristol v. Noyes*, 106 Vt. 418, 423, 174 A. 924, 926 (1934) (when part of the evidence included in an offer is

---

[3] Although we do not ground our decision on this point, we cannot conclude that the transcript supports plaintiffs' proffer that it was relevant to show that evidence of serious injuries to the public were ignored by Congress "because of the influence of the cotton lobbyists." The transcript is of a public Congressional hearing in which witnesses testified on their position on proposed legislation, a part of which would give the Secretary of Commerce authority to create and amend flammability standards. The proposed legislation would not have made flammability standards more strict; it did not directly address those standards. Moreover, although the industry representatives testified against the proposed legislation, *it passed over their objection.* See Flammable Fabrics Act Amendments, Pub. L. No. 90-189, 81 Stat. 568-69 (1967) (codified as amended at 15 U.S.C. §§ 1191-1204). In addition, the transcript was of a hearing that occurred thirty-two years before the trial, and the system of flammability regulation has changed since that time. See *Wilson v. Bradlees of New England, Inc.*, 96 F.3d 552, 555 (1st Cir. 1996) (describing history of current regime). Events that are remote in time necessarily lose their logical relevancy. See *State v. Raymond*, 148 Vt. 617, 623, 538 A.2d 164, 167 (1987).

inadmissible, entire offer is vitiated); *Brooks v. City of Mt. Vernon*, 720 N.Y.S.2d 832, 833 (App. Div. 2001) (mem.) (court erred by refusing to permit party offering document into evidence to redact inadmissible portion).

The trial court here considered redaction but acceded to plaintiffs' counsel's position that he was entitled to the admission of the whole transcript. That ruling was clearly error. *Bristol*, 106 Vt. at 423, 174 A. at 926; *Brooks*, 720 N.Y.S.2d at 833. As demonstrated earlier, moreover, the irrelevant matter that was improperly admitted was highly prejudicial, including the untested hearsay testimony of the father of a child scarred for life when her cotton blouse burst into flames, just as plaintiff's cotton blouse here ignited; the testimony of the President's advisor that 2000 to 3000 persons die every year from clothing fires; and the testimony of a representative of a trial lawyers' association on the therapeutic value of large damage awards in clothing burn cases, and the alleged misuse of federal flammability standards by defense lawyers.

Compounding the prejudicial effect of these statements was plaintiffs' counsel's disregard of the court's instruction not to cite the document for other purposes, such as the number of injuries from clothing fires.[4] Counsel, in fact, not only violated the instruction by quoting Betty Furness on the number of people who die from clothing fires each year, but went well beyond anything supported by the evidence in pursuit of plaintiffs' theory that proper safety standards would exist if it were not for the actions of "cotton lobbyists." Thus, counsel asserted that the industry standard had remained static for thirty years because of "industry spokesmen"; that Congress "ignored" the testimony of consumer advocates such as Furness when, in fact, Congress enacted the bill before it; and that cotton lobbyists had spent "billions of dollars" to prevent label warnings, sacrificing "a few kids get[ting] burned to a crisp" out of purely venal interests. In fact, no evidence, not even the improperly admitted hearing transcript, supported such claims. In addition to the above arguments, plaintiffs' counsel twice drew the jury's attention to the opportunity they would have to read the transcript once they reached the jury room.

---

[4] Ignoring the error in admission of the highly prejudicial evidence, the dissent argues that the failure of defendants' counsel to object to the closing argument resulted in a waiver of any claim on appeal. We reiterate that the fundamental error was in the admission of the Congressional hearing transcript, and not the closing argument based upon it. Once the court admitted the hearing transcript, plaintiffs' counsel was entitled to try to persuade the jury to read it during deliberations.

■ In sum, it is impossible to read the arguments to the jury without concluding that the inadmissible transcript of a largely irrelevant Congressional hearing held 30 years before the trial, containing highly prejudicial, irrelevant, and inadmissible hearsay testimony, became a central focus in a theory that the jury should send a message to cotton lobbyists through a large verdict for plaintiffs. We conclude, therefore, that defendants were denied a fair trial, and that the judgment must be reversed.

Because of our disposition, we do not separately consider defendants' argument that the closing argument was itself grounds for reversal.

*Reversed and remanded.*

**Amestoy, C.J.,** dissenting. I agree that the Congressional subcommittee hearing report was erroneously admitted, but I disagree with the ultimate conclusion of the majority that its admission compels reversal because "defendants were denied a fair trial." I therefore respectfully dissent.

No task of an appellate court is more difficult than attempting to assess from a cold record the fairness of a trial. The challenge is particularly difficult when, as here, experienced trial counsel for both parties test the bounds of advocacy in an emotionally charged case involving traumatic injury to a young child. I do not quarrel with the majority's assessment that the tactics of plaintiffs' counsel merit disapproval, but for the reasons set forth below I do not believe we should find reversible error where an "experienced trial judge on the scene put the matter soundly to the jury." *State v. Slocum,* 132 Vt. 476, 480, 321 A.2d 51, 54 (1974).

Although the majority correctly characterizes the evidentiary issues that led to the admission of the Congressional subcommittee report as having arisen in the context of the parties' dispute over the weight to be accorded to the federal standard on the flammability of cotton, the characterization does not fully capture the nature of the defense in this case. A recurring theme repeatedly emphasized by defendants was that the flammability of cotton clothing was obvious to an ordinary consumer.*

---

* Defendants' counsel sought to make the point in cross-examination of the child's mother:

By both explicit and implicit argument, defendants sought to convey to the jury the message that a finding of liability would subject cotton manufacturers to lawsuits which in turn could compromise the economic vitality of an industry. Thus, for example, defendants' counsel began his opening argument as follows:

> There's no real question in the case about Stephanie's injuries . . . . We feel sorry about that. And we are not here to really talk much about that at all . . . . What this case is about, however, . . . what Mr. Hemley is asking you to find, that this ordinary routine thing that we are all intimately familiar with . . . that we all own . . . that this is somehow a dangerous and defective product that you people should say should not be on the market. That's what he is asking you . . . .

Defendants coupled their assertion that plaintiffs were asking the jury to find that cotton "is some kind of defective, dangerous, bad product and they want you to say take it off the market" with the representation that the garment issued passed a flammability standard that, although unchanged since 1953, "is periodically reviewed by Congress by the Consumer Product Safety Commission to see if it is a good standard."

The plaintiffs' aggressive counter-arguments relating to flammability standards should be viewed within the context of plaintiffs' counsel seeking to overcome defendants' specific defense to plaintiffs' factual allegations *and* defendants' more general defense that a verdict for plaintiffs would put a staple of American life — the manufacture of cotton garments — at risk.

This context was well understood by the trial judge in assessing the use to which the disputed Congressional report was to be put by plaintiffs' counsel. As the majority accurately points out, the court considered the document in evidence for the limited purpose of depicting cotton industry lobbying of the flammability standards. The majority's identification of the potentially prejudicial testimony contained within the exhibit is much more specific than that made by defense counsel at the time of the objection. Although defense counsel certainly preserved his objection, his description of the report's contents — "It's basically just a bunch of testimonials from a lot of people who have an interest one way or another on this thing" —

---

Q: Ms. Needham, you're not telling the jury that you didn't know clothing would burn, are you?

R: No. I said I didn't know that it would burn like that.

cannot be said to have alerted the trial court to the potential prejudicial impact, now so apparent to an appellate court with the advantages of hindsight and reflection.

I accept the majority's assessment that closing argument of plaintiffs' counsel was improper, most egregiously in its disregard of the trial court's evidentiary ruling that the exhibit was not to be cited for purposes such as the number of injuries from clothing fires. It is, in fact, defendants' failure to afford the trial court the opportunity to cure the improper use to which the disputed exhibit was put in plaintiffs' closing argument that should govern our resolution of this appeal.

The general rule "is that a timely objection is necessary to bring to the trial court's attention alleged errors in the conduct of a trial." *Woods v. Burlington N. R.R.*, 768 F.2d 1287, 1292 (11th Cir. 1985), *rev'd on other grounds*, 480 U.S. 1 (1987). "The rule is applied to argument of counsel, even argument found to be inflammatory, prejudicial and improper." *Id.*

Defendants failed to request a corrective charge to the jury to address any statements they deemed improper. We recently reemphasized our reluctance "to overturn a jury verdict based on the arguments of counsel." *Brown v. Roadway Express, Inc.*, 169 Vt. 633, 635, 740 A.2d 352, 356 (1999) (mem.). This is particularly true where, as here, defendants' counsel expressed the view that a curative charge would be futile. See *id.* (where counsel did not seek a curative instruction because he thought it likely to "do more harm than good," trial court did not abuse its discretion in not giving a more strongly worded admonition to the jury).

In the instant case, the trial court instructed the jury that "arguments made by the lawyers are not evidence in the case." See *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 51 (2d Cir. 1998) (noting that claims of improper appeals to juror bias must be evaluated "in the context of the entire trial" and standard jury instructions that arguments of counsel are not evidence). Although defendants argue strenuously that plaintiffs' counsel's closing argument *must* have had a prejudicial effect, the burden of such a demonstration is on the appellant. See *Debus v. Grand Union Stores of Vermont*, 159 Vt. 537, 544-45, 621 A.2d 1288, 1293 (1993) ("heavy handed" closing argument of plaintiff does not entitle defendant to new trial where defendant makes no showing that plaintiff's argument had a prejudicial effect, nor can one be found in the record).

Even where we have disapproved of counsel's "argumentative tactics," *Slocum*, 132 Vt. at 479, 321 A.2d at 54, or have found that

counsel's argument "exceed[ed] the bounds of propriety," *State v. Bailey,* 144 Vt. 86, 100-01, 475 A.2d 1045, 1054 (1984), *abrogated on other grounds by Arizona v. Youngblood,* 488 U.S. 51 (1988), we have not found reversible error. The tactical decisions of sophisticated trial counsel to neither ask for a limiting instruction to reduce the risk of juror misuse of the erroneously admitted exhibit, see *Haynes v. Golub Corp.,* 166 Vt. 228, 236, 692 A.2d 377, 382 (1997), nor to seek a curative instruction to address prejudicial remarks in closing argument, see *Bailey,* 144 Vt. at 101, 475 A.2d at 1054, should not compel reversal where an experienced trial judge — in a far superior position to evaluate prejudicial effect than an appellate court — has not found prejudice. See *State v. Mears,* 170 Vt. 336, 345-46, 749 A.2d 600, 607 (2000) (trial court in best position to evaluate any prejudicial effect; therefore, we will uphold its ruling "unless the court's discretion was either totally withheld or exercised on grounds clearly untenable or unreasonable" (internal quotation marks and citations omitted)). I do not believe that the erroneous admission of the disputed exhibit was so prejudicial as to deny defendants a fair trial. Therefore, I respectfully dissent. I am authorized to state that Justice Morse joins me in this dissent.