## State of Vermont v. Michael Brillon

[995 A.2d 557]

No. 05-167

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed March 19, 2010

*Christina Rainville*, Bennington County Chief Deputy State's Attorney, Bennington, for Plaintiff-Appellee.

*William A. Nelson*, Middlebury, and *Dan Barrett*, ACLU Foundation of Vermont, Montpelier, for Defendant-Appellant.

¶ 1. **Skoglund, J.** This appeal is before us a second time following the United States Supreme Court's reversal of our prior decision, wherein we concluded that defendant had been deprived of his right to a speedy trial in violation of the Sixth Amendment to the U.S. Constitution. See *Vermont v. Brillon*, 556 U.S. ___, 129 S. Ct. 1283 (2009) (remanding case after rejecting this Court's analysis of speedy-trial balancing test under the Federal Constitution). On remand, defendant urges us to consider the speedy trial issue under the Vermont Constitution. Defendant also reasserts the additional claims of error raised in his original appeal, including that the trial court erred in: (1) refusing to bifurcate the aggravating element based on violation of a condition-of-release order from the underlying offense of domestic assault, (2) declining to accept defendant's stipulation to the existence and purpose of the order; (3) permitting the prosecutor to question defendant about whether he had committed perjury in a different case; and (4) denying defendant's request to withdraw his waiver of a jury trial to the habitual offender charge. We do not reach the speedy trial issue under the Vermont Constitution because we conclude that defendant failed to adequately raise this ground in his original appeal. As to the additional claims of error, we conclude that the trial court erred in denying defendant's request to bifurcate the aggravation element of the domestic assault charge. Thus, we reverse and remand for a new trial.

¶ 2. We briefly recount the facts, which are set forth in detail in our original decision, *State v. Brillon*, 2008 VT 35, 183 Vt. 475, 955 A.2d 1108 [hereinafter *Brillon I*]. The charges involve defendant's girlfriend of several years with whom he had a child. In July 2001,

after the two were no longer together, defendant was charged with felony domestic assault after allegedly striking his former girlfriend in an altercation. Because the assaultive behavior would also violate a court order previously imposed to protect the alleged victim, what would ordinarily constitute a misdemeanor domestic assault was elevated to a felony domestic assault. 13 V.S.A. § 1044(a)(1) (enhancing domestic assault to second-degree aggravated domestic assault if the person commits domestic assault that causes bodily injury to another person and, in doing so, "violates specific conditions of a criminal court order in effect at the time of the offense imposed to protect that other person").[1] The criminal court order in effect at the time of the charged offense was a condition-of-release order imposed following an incident wherein defendant was charged with unlawful mischief for allegedly slashing the tires on his girlfriend's car in June 2000. The condition-of-release order required that defendant not "harass" his girlfriend or cause her "to be harassed." About three weeks after the imposition of the conditions of release, defendant's now ex-girlfriend drove defendant to the local police station for a required check-in before they were to return to her home so that defendant could visit his daughter. The ex-girlfriend left after dropping off defendant because she apparently believed that he was going to be detained. Defendant was not detained by police, and eventually got a ride with his ex-girlfriend's sister to his ex-girlfriend's house. Defendant was angry about being left behind, and an argument ensued. At some point, his ex-girlfriend started to leave her home with their daughter, and defendant allegedly struck his ex-girlfriend in the face. The police were called, and defendant was arrested, charged with felony second-degree aggravated domestic assault and contempt of court based on a violation of a condition of release, 13 V.S.A. § 7559(e). The aggravated domestic assault felony was also charged as a predicate for habitual offender treatment, authorizing life imprisonment. See 13 V.S.A. § 11.

¶ 3. Following his arrest in July 2001, defendant was held on a no-bail order until his case was finally tried in June 2004. During the almost three years between his arrest and his trial, defendant

---

[1] This statute was amended generally in 2008, and the section under consideration now appears as 13 V.S.A. § 1044(a)(1)(A). We refer throughout this opinion to the section number as it was at the time of the trial.

was represented by assigned counsel through the Defender General's office and had six attorneys. Following defendant's eventual trial, the jury returned a guilty verdict on the domestic assault and contempt charges, and defendant was sentenced to twelve-to-twenty years in prison. Defendant appealed his conviction, asserting several claims of error, including that he was denied his right to a speedy trial. U.S. Const. amend. VI. This Court examined the delay under the balancing test articulated in *Barker v. Wingo*, 407 U.S. 514, 530 (1972), and concluded that all factors were in defendant's favor. We held that the length of delay was extreme, and that almost two years of the delay was attributable to the state. *Brillon I*, 2008 VT 35, ¶¶ 17, 32. We attributed this time period to the state judicial system as a whole, not the prosecution, because during that time defendant was either without counsel or his counsel did very little to move defendant's case forward, and we held that "ultimately it is the court's responsibility to assure that [the criminal justice system] prosecutes defendants in a timely manner." *Id.* ¶ 35. We concluded that defendant had aggressively demanded to be tried and his lengthy pretrial incarceration resulted in prejudice. *Id.* ¶¶ 39, 49. Thus, we held that defendant was deprived of his right to a speedy trial and entitled to dismissal of the charges against him. *Id.* ¶ 50.

¶ 4. On petition from the state's attorney, the Supreme Court of the United States accepted certiorari on the question of whether delays caused by a public defender could be charged against the state. The Supreme Court held that this Court "erred in ranking assigned counsel essentially as state actors in the criminal justice system," *Vermont v. Brillon*, 556 U.S. at ___, 129 S. Ct. at 1287, and in mistakenly counting against the state periods of time when defendant's public defender failed to move defendant's case forward, *id.* at ___, 129 S. Ct. at 1291-92. The Court further held that defendant's "deliberate attempt to disrupt proceedings" by forcing the withdrawal of his first and third attorneys should be weighed heavily against defendant. *Id.* at ___, 129 S. Ct. at 1292. Thus, the Court concluded that the record did not demonstrate that defendant was denied "his constitutional right to a speedy trial." *Id.* at ___, 129 S. Ct. at 1293. The case was remanded back to this Court.

I.

¶ 5. First, we address defendant's argument that we should again examine his claim that his right to a speedy trial was

violated, but this time under the protections of the Vermont Constitution. See Vt. Const. ch. I, art. 10 (affirming that persons have a right in criminal prosecutions to "a speedy public trial by an impartial jury"). Defendant claims that our original analysis was correct and that the holding of *Brillon I* should be reinstated on state constitutional grounds. In deciding whether to engage in this analysis, we are mindful that we are "the final judicial interpreters of the Vermont Constitution," and we encourage litigants to address claims under our state charter. *Chittenden Town Sch. Dist. v. Dep't of Educ.*, 169 Vt. 310, 319, 738 A.2d 539, 546 (1999). Nonetheless, we will not address state constitutional claims where they are insufficiently raised and inadequately briefed. On remand from the U.S. Supreme Court, we requested briefing from the parties on, among other things, "whether this Court should find a speedy-trial violation under the Vermont Constitution, given the current state of the record." Despite our direction, the parties' briefs were unresponsive to the issue of preservation. Having reviewed the record, we conclude that the state constitutional claim was not adequately raised or briefed, and therefore decline to analyze defendant's speedy-trial argument under the Vermont Constitution.

¶ 6. Advocates have a "duty to diligently develop and plausibly maintain" state constitutional issues. *State v. Gleason*, 154 Vt. 205, 212, 576 A.2d 1246, 1250 (1990). Merely citing the Vermont Constitution, without providing any analysis of how the state constitutional provision compares with its federal analog, does not adequately present the issue for our review, especially where the argument was not presented in the trial court. See *State v. Maguire*, 146 Vt. 49, 54, 498 A.2d 1028, 1031 (1985) (declining to address state constitutional argument where it was insufficiently raised and inadequately briefed). Although defendant cited the Vermont Constitution in his pleadings to the trial court and his original brief on appeal, he did not provide any "substantive analysis of the Vermont Constitution, nor d[id] he set forth any rationale as to how our analysis of this constitutional claim should differ under the Vermont Constitution in comparison with the federal constitution." *State v. Raymond*, 148 Vt. 617, 619 n.1, 538 A.2d 164, 165 n.1 (1987); see *State v. Chapman*, 643 A.2d 1213, 1219 (Conn. 1994) (concluding that the defendant's state constitutional claim was not adequately raised where the defendant's brief included no "reference to the language or history of [the relevant

constitutional provision], no reference to prior constitutional decisions of this or other states, and no reference to policy considerations").

¶ 7. Likely for this reason, the trial court did not address defendant's state constitutional claim. Having failed to raise the issue adequately in the trial court and in his original appeal, we conclude that defendant has waived consideration of this issue on remand. Compare *State v. Tripp*, 2004 VT 26, ¶ 2, 176 Vt. 604, 848 A.2d 343 (mem.) (holding that the defendant whose federal constitutional claims were rejected in an interlocutory appeal from a motion to suppress "waived his Article 11 claim [in direct appeal] by not presenting it adequately in his original motion to suppress or in his brief in the interlocutory appeal"), and *State v. Montoya*, 861 P.2d 978, 982 (N.M. Ct. App. 1993) (concluding that the defendant failed to preserve argument that state constitution provided adequate and independent ground for reversal where the defendant "failed to discuss or argue that any different protection is offered" by the state constitution), with *First Covenant Church of Seattle v. City of Seattle*, 840 P.2d 174, 186 (Wash. 1992) (addressing state constitutional claim on remand where initial briefing sufficiently raised state constitution as an adequate and independent ground). Thus, we turn to defendant's additional claims of error.

## II.

¶ 8. Defendant argues that the trial court erred in denying his request to bifurcate the aggravated portion of his domestic assault charge. Some additional facts are necessary to understand the context of this argument. Defendant was charged with aggravated domestic assault, which requires factors from two separate statutory provisions. Misdemeanor domestic assault is defined in 13 V.S.A. § 1042 as actions causing "bodily injury to a family or household member," and carries a penalty of not more than eighteen months in prison or a fine of not more than $5000. Domestic assault may be enhanced to second degree aggravated domestic assault, a felony, if, among other things, the person committing the assault also violates "specific conditions of a criminal court order in effect at the time of the offense imposed

to protect [the victim of the assault]." 13 V.S.A. § 1044(a)(1).[2] As noted, defendant was under a condition-of-release order to not harass his former girlfriend when the charged incident occurred.

¶ 9. In May 2004, defendant filed a motion to bifurcate the substantive domestic assault offense from the aggravated enhancement for violating the condition-of-release order and to sever the contempt charge based on violation of the conditions of release.[3] Defendant argued that if the enhancement was not bifurcated and the contempt not severed there was great potential for unfair prejudice because the jury would hear about the no-harassment condition, as well as the unlawful mischief charge stemming from his then-girlfriend's allegation that defendant had slashed her tires. Defendant proffered that the jury could infer from this information that defendant had previously harmed his ex-girlfriend and was therefore likely to do so again. See V.R.E. 404(b) (evidence of past wrongs may not be introduced to demonstrate defendant's character and propensity to commit crime). Defendant claimed that the risk of prejudice was particularly great in his case because, although the unlawful mischief charge had not yet been proven, the judicial condition-of-release order made it appear that defendant was guilty of the conduct. Defendant additionally argued that the condition-of-release order was not relevant to the underlying charge and therefore its existence had no probative value. For all these reasons defendant argued that the proceeding should be bifurcated so that the existence and content of the condition-of-release order could be excluded from the initial phase of the trial.

¶ 10. The State opposed defendant's request. The State argued that bifurcation was reserved for enhanced penalties depending on proof of prior convictions, conceding that if the aggravating element was a prior conviction for domestic assault, then bifurcation would be warranted. See 13 V.S.A. § 1043(a)(3) (enhancement based on prior conviction). The State further argued that the existence of the court order of protection was an element of the

---

[2] The penalty for violation of this section is imprisonment up to five years and a fine of not more than $10,000.

[3] As already noted, the felony aggravated domestic assault charge provided the basis for a habitual offender enhancement, which made defendant eligible for a sentence of life imprisonment. Defendant also requested that the habitual offender charge be bifurcated. The State agreed, and the court granted this request.

charge, not an enhancement, and therefore there were no grounds to bifurcate it.

¶ 11. In an oral ruling, the court denied defendant's request. The court concluded that existence of the condition-of-release order was an element of the offense and that there was no legal basis to bifurcate an element which did not involve a prior conviction.[4] The court further likened the situation to those "where prior other conduct, bad or otherwise, is permitted in the trial for certain purposes under Rule 404," but then never explained how that rule applied.

¶ 12. On appeal, defendant reasserts the arguments made in the trial court, arguing that the aggravation element should be bifurcated because the substantial risk of prejudice outweighs any probative value. We agree. Bifurcation is appropriate when the prejudice from introducing the bifurcated factor outweighs any relevance or factual connection the factor holds to the rest of the charge. Given the limited probative value of the condition-of-release order to the elements of the domestic assault charge and the substantial risk of prejudice from introducing it, we conclude that it should have been bifurcated in this case. The trial court erred in not applying this balancing test and in denying defendant's request. To more fully explain our decision we begin by discussing the history of bifurcation and then explain in more detail when it is required.

¶ 13. The issue of bifurcating penalty enhancements from the liability portion of an offense was first addressed in *State v. Cameron*, 126 Vt. 244, 227 A.2d 276 (1967). In that case, the defendant was charged with driving with license suspended (DLS), and the State sought an enhanced sentence based on the defendant's prior DLS convictions. However, the State failed to notify the defendant of its intent to seek enhancement in the criminal information. This Court held that if the State intends to seek greater punishment based on a prior conviction then the State must charge the principal offense and the prior conviction in two parts in the complaint. *Id.* at 249-50, 227 A.2d at 279. In addressing the proper procedure for trying the case, this Court endorsed the following two-step process. First, the State should

---

[4] Defendant renewed his objection in a post-trial motion for a new trial. The court also denied this request.

prove the facts of the principal offense, and second, in a separate proceeding, it should "determine the liability of an accused to punishment as a subsequent offender." *Id.* at 249, 227 A.2d at 280. We explained that this process appropriately balances the probative versus prejudicial effect of the evidence in that prior convictions are not relevant to the defendant's liability to the substantive offense, but are highly prejudicial to a defendant. "To project the issue of the accused's former conviction(s) into the trial for a subsequent offense, before verdict, practically deprives the respondent of the legal presumption of innocence, [and] inevitably prejudices the jury against him . . . ." *Id.* at 250, 227 A.2d at 280; see also *State v. Ferrone*, 113 A. 452, 457 (Conn. 1921) ("It cannot be believed that an accused man would ever have a fair trial, resulting in a verdict not affected by prejudice or by considerations by which the jury should not be influenced, if during that trial allegations that he has twice before been convicted . . . has been placed before them.").

¶ 14. Since *Cameron*, we have endorsed the use of bifurcated proceedings in trials involving increased penalties for subsequent DUIs and based on habitual offender status. See *State v. Baril*, 155 Vt. 344, 348, 583 A.2d 621, 624 (1990) (affirming use of *Cameron* bifurcated proceeding in second-offense DUI); *State v. Angelucci*, 137 Vt. 272, 281, 405 A.2d 33, 37 (1979) (noting use of bifurcated trial to determine habitual offender enhancement). The main reasons given in these cases for bifurcation are the enhancement's lack of relevance to the underlying charge and the great amount of prejudice this type of evidence can cause to a defendant.[5] As we stated in *Baril*, it is necessary "to protect an accused from the prejudice that would likely result from the introduction of the accused's former conviction into the trial for the substantive offense." 155 Vt. at 348, 583 A.2d at 624. Thus, the general rule is that, in deciding whether to bifurcate, the trial court should balance the probative value of the facts giving rise to the enhancement against the danger of prejudice from the same.

¶ 15. With this background in mind, we turn to defendant's request in this case. The aggravating circumstance defendant sought to bifurcate was whether the conduct charged violated

---

[5] This is analogous to the balancing test in Rule of Evidence 403, which provides that evidence, although relevant, may be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice."

"specific conditions of a criminal court order in effect at the time of the offense imposed to protect [the victim of the assault]." 13 V.S.A. § 1044(a)(1). The facts supporting the no-harassment court-ordered condition, issued a year before the charged offense, held little probative value or factual connection to the incident that formed the basis of the domestic assault charge presented to the jury. The claims that generated the condition-of-release order were quite separate in time (one year) and nature from those related to the domestic assault charge. The order arose from an unlawful mischief charge, based on the then-girlfriend's allegation that defendant had slashed her tires — a charge that had not been resolved at the time of defendant's trial for domestic assault. As with prior convictions, this condition-of-release order did "not become material until after the conviction of the accused on the substantive offense on trial [was] established." *Cameron*, 126 Vt. at 249, 227 A.2d at 280. There is no bright-line rule, however. A court order of protection may be highly probative in an aggravated domestic assault case, but in the situation presented, had an evaluation occurred, the probative value, if any, would have been minimal indeed.

■ ¶ 16. Balanced against any tenuous relevance to the underlying charge is the possible prejudicial impact of introducing the condition-of-release order. Evidence is unfairly prejudicial to defendant when the primary purpose of the evidence is "to appeal to a jury's sympathies, arouse its sense of horror, provoke its instinct to punish, or trigger other mainsprings of human action that may cause a jury to base its decision on something other than the established propositions in the case." *State v. Bruyette*, 158 Vt. 21, 31, 604 A.2d 1270, 1274 (1992) (quotation and alterations omitted). And, it is highly prejudicial to a defendant to introduce prior bad acts to suggest propensity for criminal acts. See *State v. Moran*, 141 Vt. 10, 19, 444 A.2d 879, 883 (1982).

■ ¶ 17. Though no prior bad act had ever been established, in citing Rule 404(b), the trial court seems to have considered the tire-slashing incident to be one. Our cases and our rules recognize that so-called prior bad act evidence may be allowed " 'for *any purpose* other than proving the defendant's bad character.' " *State v. Lipka*, 174 Vt. 377, 391, 817 A.2d 27, 38 (2002) (quoting *State v. Forbes*, 161 Vt. 327, 332, 640 A.2d 13, 16 (1993)); see V.R.E. 404(b) (explaining that evidence of past wrongs is "not admissible

to prove the character of a person in order to show that he acted in conformity therewith"). It is the State's burden to show precisely how the proffered evidence is relevant to the theory advanced, how the issue to which it is addressed is related to the disputed elements in the case and how the probative value of the evidence is not substantially outweighed by its prejudicial effect. *Lipka*, 174 Vt. at 391, 817 A.2d at 39. Here, the trial court failed to engage in this analysis, though it cited Rule 404 in its decision denying bifurcation.

¶ 18. In this case, admission of the condition-of-release order was highly prejudicial in that it established for the jury that a court had found it necessary to issue a protective order on behalf of the putative victim against defendant. It had the potential to evoke the jury's sympathy and allow it to base its decision on something other than the established propositions in the case. See *Bruyette*, 158 Vt. at 31, 604 A.2d at 1274. While few courts have addressed bifurcation in factually similar situations, our holding is the same as that reached by the Superior Court of New Jersey in *State v. Lozada*, in which the court considered whether the trial court erred in failing to sever charges of stalking and violation of a domestic violence restraining order. 815 A.2d 1002, 1003 (N.J. Super. Ct. App. Div. 2003). The court acknowledged that existence of the restraining order was an element of the charge because it enhanced the crime of stalking from a fourth- to a third-degree offense. Nonetheless, the court concluded that it should be bifurcated because the existence of the restraining order was highly prejudicial to the defendant and "the jury's knowledge that there has been a restraining order is likely to prejudice defendant's right to a fair trial of the issue of whether he is guilty of conduct constituting stalking." *Id.* at 1004. Thus, the court endorsed the use of a bifurcated trial to remedy the situation and reversed Lozada's conviction. *Id.* We similarly conclude that given the danger of unfair prejudice and the limited relevance of the evidence, bifurcation was warranted in this case.

¶ 19. We further conclude that the error was not harmless. Error is harmless if we can say beyond a reasonable doubt that the jury would have convicted absent the error. *Lipka*, 174 Vt. at 384, 817 A.2d at 34. "When conducting a harmless-error analysis to determine whether the jury would have convicted without the offending evidence, we consider the extent to which the offending

evidence was inculpatory, whether it was cumulative or duplicative of other evidence, and how prominent it was at trial." *State v. Mumley*, 2009 VT 48, ¶ 20, 186 Vt. 52, 978 A.2d 6. In this case, given the strong prejudicial nature of the condition-of-release order, its multiple references at trial, and the noncumulative nature of the evidence, we conclude that its inclusion was not harmless.

¶ 20. Both the content of the condition-of-release order and the facts supporting unlawful mischief allegation were introduced and mentioned several times during the trial. In opening statements, the State explained that as a result of problems in the relationship between defendant and his ex-girlfriend, defendant was under "conditions of release which indicate[d] that he cannot harass [his ex-girlfriend]." The ex-girlfriend testified that in June 2000 defendant had been angry and upset with her on a certain day and that later that night she had discovered her tires were cut. The ex-girlfriend stated that as a result of this incident defendant had to check in at the police station. In closing, the State mentioned that defendant had been charged with slashing his ex-girlfriend's tires and "as a result of that incident, the court issued out conditions of release, and one of those conditions was that he not harass [the ex-girlfriend]." The State further stated that "the only legal reason . . . that that court order was in place was to prevent [defendant] from harassing and threatening [his ex-girlfriend]." Therefore, the jury was presented with evidence that defendant had been charged with a crime involving this alleged victim — a charge not yet proven — and that the court deemed defendant was enough of a threat to his ex-girlfriend to issue an order against defendant for her protection. This information could certainly create an inference that defendant had a propensity to engage in harm against this victim, and the substance of the order implied that defendant was a danger to this victim, notwithstanding the fact that the malicious mischief occurred a year prior with no relevant court action since.[6] Despite the generalized instruction at the end of trial, the court did not instruct the jury on how to

---

[6] In dissent, Chief Justice Reiber posits that the prosecutor's statement in his closing cured any risk the jury would improperly consider the condition-of-release order as evidence that defendant had a history of abuse against his ex-girlfriend and had a propensity to engage in this behavior. In effect, the dissent implies that the prosecutor's statement is equivalent to a curative statement from the court. This is simply not the case.

view the prior incident between defendant and his ex-girlfriend. See *Moran*, 141 Vt. at 20, 444 A.2d at 884 (holding that trial court's "perfunctory cautionary instruction" that did not specifically address improperly admitted statements did not eliminate prejudice to the defendant).

¶ 21. Balanced against this strong indication of prejudice is the strength of the prosecution's case overall. See *Lipka*, 174 Vt. at 385, 817 A.2d at 34 (explaining that harmless error hinges on "the strength of the prosecution's case without the offending evidence and the strength of the offending evidence"). We have cautioned that it is not this Court's role to determine if defendant is guilty on the facts, but to determine "what the jury might have done without the offending evidence." *Id.* Chief Justice Reiber's dissenting claim that "[t]he evidence of guilt was not close," *post*, ¶ 64, is not supported by the record. Defendant did not dispute that there was a scuffle and that as a result his ex-girlfriend was injured. He did dispute, however, that he intentionally punched her in the face. Although other witnesses testified to events that occurred before and after the actual altercation, only defendant and his ex-girlfriend testified as to what occurred at the side of the car. Thus, the case ultimately came down to a credibility determination between defendant and his ex-girlfriend. Under these circumstances, we cannot say that the prosecution's case was so strong that the prejudice caused by introducing the condition-of-release order can be ignored. Thus, the error was not harmless because we are not assured beyond a reasonable doubt that the jury would have convicted defendant if it had not been presented with the information. See *Lipka*, 174 Vt. at 384, 817 A.2d at 33-34.

¶ 22. Finally, it is appropriate to respond to the trial court's rationale for denying defendant's request so as to provide direction for future cases. While generally the trial court has broad discretion in balancing the prejudicial impact of evidence, it is error if "the court either completely withheld its discretion or exercised it on grounds clearly untenable or unreasonable." *State v. Shippee*, 2003 VT 106, ¶ 13, 176 Vt. 542, 839 A.2d 566 (mem.). As noted, in this case the court did not balance the prejudicial and probative impact of the evidence. Instead, the trial court primarily denied defendant's request because the court held the aggravating factor defendant sought to bifurcate was an element

of the offense and not a prior conviction. This approach was too simplistic. As explained above, the purpose of bifurcation is to prevent undue prejudice to a defendant due to introduction of facts not relevant to the basic elements of the crime. The trial court's reasoning is based on distinctions that have little to do with the court order's potential prejudice to defendant or its connection to the rest of the charge. This was error.

¶ 23. Even accepting the trial court's characterization of the protection order as an element of aggravated domestic assault, this choice in labeling does not end the inquiry. The difference between an element of a crime and an enhanced penalty provision is sometimes viewed as merely the result of the legislature's choice in labeling. See *United States v. Michael*, 10 F.3d 838, 841 (D.C. Cir. 1993) (considering statutory language, legislative history and character of the factor to determine if factor is a sentence enhancement or an element). We have distinguished enhancements as "part of a statutory structure that, on proof of certain defined facts, enlarges the range of punishments available for certain criminal activity." *State v. Thompson*, 150 Vt. 640, 644, 556 A.2d 95, 98 (1989). This distinction previously held significant import to a defendant because sentence enhancement classification meant "shifting the issue from jury to court and denying the defendant the benefit of the reasonable doubt standard." *Michael*, 10 F.3d at 842. In *Apprendi v. New Jersey*, the U.S. Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. 466, 490 (2000). The Court explained that this requirement is not dependent on how the legislature chooses to label the factor, *id.*, explaining that "[a]ny possible distinction between an 'element' of a felony offense and a 'sentencing factor' was unknown to the practice of criminal indictment, trial by jury, and judgment by court as it existed during the years surrounding our Nation's founding." *Id.* at 478 (footnote omitted). Thus, following *Apprendi*, the Supreme Court treats "sentencing factors, like elements, as facts that have to be tried to the jury and proved beyond a reasonable doubt." *Washington v. Recuenco*, 548 U.S. 212, 220 (2006). Given the need to prove both elements and enhancements to a jury, there is little reason to deny or grant bifurcation based solely on how the factor a defendant seeks to bifurcate is labeled. The critical reasons for bifurcation — lack of

relevance to the crux of the charge and substantial risk of prejudice to the defendant — are not reflected by the labeling of the factor as an element or an enhancement.

¶ 24. In this case, defendant was charged with *aggravated* domestic assault based on the fact that a criminal court order was in effect at the time of the offense that was imposed to protect the alleged victim of the assault. 13 V.S.A. § 1044(a)(1). That is, the fact of a court order of protection, while an element of the aggravated crime, also elevated the crime of domestic assault to a felony so that the punishment if convicted is accordingly enhanced. Most of our cases involving aggravating factors similar to the one at issue here have concluded that those factors are enhancements, rather than necessary elements of the crime. In *State v. Ritter*, we described the separate subsections of § 1044(a) — the statutory provisions increasing the penalty for domestic assault if the assault violates an order of protection or if the perpetrator has a prior conviction — as defining different aggravating circumstances of domestic assault, not as each creating a separate offense. 167 Vt. 632, 633, 714 A.2d 624, 626 (1998) (mem.) ("Because defendant's unitary act occurred under aggravating circumstances, it is punishable as second-degree aggravated domestic assault rather than domestic assault.").[7] Similarly, in *State v. Dunbar*, we construed the felony for violating an abuse-prevention order based on second offense, 13 V.S.A. § 1030(b), as an enhanced penalty provision, and endorsed use of a bifurcated trial to determine the validity of the enhancement. 172 Vt. 557, 557-58, 772 A.2d 533, 534-35 (2001) (mem.); see also *State v. Crepeault*, 167 Vt. 209, 212, 704 A.2d 778, 781 (1997) (describing aggravated sexual assault charge based on serious bodily injury as an enhancement). Along those same lines, in *State v. Galvin*, the defendant was charged with assault on a police officer, and we held that the elements of the crime were wholly defined by the simple assault statute, 13 V.S.A. § 1023(a)(1), and that § 1028, setting a higher penalty if the crime was against a law enforcement officer, served "simply as an enhanced penalty provision." 147 Vt. 215, 217, 514 A.2d 705, 707 (1986).

¶ 25. The State agrees that if defendant had a prior conviction for domestic assault and consequently had been charged with aggravated domestic assault under 13 V.S.A. § 1044(a)(2), then he

---

[7] No issue of bifurcation was raised in *Ritter*.

would have been entitled to a bifurcated trial. There is nothing structurally different, however, between the manner in which the Legislature has written the aggravated domestic assault charge based on a prior conviction, and the aggravated domestic assault charge brought in this case based on violation of a protection order. It is illogical to presumptively allow bifurcation for the former and flatly deny it for the latter.

¶ 26. Furthermore, the labeling of element versus enhancement is not a determinative distinction because the connection of a bifurcated factor to the underlying offense and its prejudicial effect to defendant do not change depending on how the factor is labeled. These points are best illustrated by example. Some aggravating factors are factually intertwined with the underlying offense, including where the aggravation is based on characteristics of the crime itself such as the type of harm caused, the identity of the victim, or the use of a weapon. See, e.g., 13 V.S.A. § 1043(a)(2) (defining first degree aggravated domestic assault to include cases involving use of a deadly weapon); *id.* § 1063(a)(4)-(5) (including in definition for aggravated stalking circumstances where victim is under sixteen or where actor possesses a deadly weapon); *id.* § 3253 (defining aggravated sexual assault based on various aggravating factors including causing serious bodily injury, using a deadly weapon, or perpetrating a crime against a victim under thirteen). In those cases, the aggravating factor's close relationship to the main offense may increase its probative value and weigh against bifurcation. Similarly, some factors may not carry a high risk of prejudice, and this consideration would also weigh against bifurcation. See, e.g., *Michael*, 10 F.3d at 842 (considering statutory provision increasing penalty for drug possession if the drug is cocaine and noting that character of drug not highly prejudicial to defendant).

¶ 27. This approach also rejects the trial court's reasoning that bifurcation was not appropriate because the bifurcated element was not a prior conviction. The trial court noted that our past cases involving bifurcation all involved recidivist statutes, and extrapolated that bifurcation is limited to prior convictions. We do not draw the same conclusion. While our previous bifurcation cases have all involved prior convictions, this can be attributed to the fact that most enhancement statutes are based on commission of a prior offense, not because there is something talismanic about a prior conviction. The critical factors are whether the bifurcated

enhancement is relevant and factually related to the predicate offense and the level of prejudice involved in introducing it. Introduction of prior bad acts — such as the existence of a condition-of-release order barring defendant from harassing the victim — should result in a similar balancing as introduction of a prior conviction. As we have previously explained, "the potential unfair prejudice to the defendant is great from evidence of a past unpunished crime that is similar to that for which he is charged." *State v. Winter*, 162 Vt. 388, 399, 648 A.2d 624, 631 (1994). Indeed, some commentators have suggested that uncharged crimes are even more prejudicial to a defendant than a prior conviction because the jury may be tempted to punish the accused for other crimes. E. Imwinkelried, *The Use of Evidence of an Accused's Uncharged Misconduct to Prove Mens Rea: The Doctrines that Threaten to Engulf the Character Evidence Prohibition*, 130 Mil. L. Rev. 41, 48 (1990). In addition, prior acts are just as likely as prior convictions to hold little to no probative value in proving the principal offense.

¶ 28. While it is illogical to categorically reject bifurcation simply because the factor at issue is not a prior conviction, there may also be valid reasons to deny bifurcation even for a prior conviction. For example, several state and federal courts have denied requests to bifurcate the prior-conviction element of a felon-in-possession charge because of the possibility of creating jury confusion. See, e.g., *State v. Brown*, 853 A.2d 260, 264-66 (N.J. 2004) (citing cases). If a felon-in-possession charge is bifurcated into the possession and the convicted felon status elements, the jurors in the first phase of the trial solely involving possession may question the criminality of the offense because possession for most people is not a crime. *Id.* at 266. Without a complete crime to present to the jury, bifurcation may result in confusion for jurors and may influence the results of the initial phase of trial. See *id.* ("Doubt as to the criminality of [the defendant's] conduct may influence the jury when it considers the possession element." (quotation omitted) (alteration in original)).

¶ 29. This concern is not present in the current case. Bifurcating the existence of the condition-of-release order would not result in an incomplete crime. The jury would be required to first determine whether defendant committed domestic assault, a complete crime, and then subsequently consider whether a court order protecting the victim existed at the time. For this reason, we are

not concerned with the State's prediction that if we allow bifurcation in this case, it will open the door to requiring bifurcation for all prosecutions for violations of condition-of-release orders and violations of protective orders. In these cases, the existence of the condition is a necessary element of the offense; in other words, there is no crime without a prior order.

¶ 30. In sum, we hold that the best method for determining whether a particular portion of the charge should be bifurcated from the main crime is by balancing the element's probative value against the risk of undue prejudice to defendant. We conclude that the balance weighs in favor of bifurcation in this case. Because of the required severance, the contempt conviction as well as the domestic assault conviction must be reversed. The contempt conviction was based on the domestic assault, and defendant did not receive a fair trial on that charge because it was tainted by the evidence of the condition-of-release order. If the conviction of the underlying crime must be reversed, then so must the conviction of contempt because the criminal conduct supporting each conviction was identical. Because we reverse and remand for a new trial on the bifurcation issue, we do not reach defendant's additional claims of error.

*Reversed and remanded for a new trial.*

¶ 31. **Johnson, J.,** dissenting in Part I, and concurring in Part II. I do not agree that we decided defendant's original speedy-trial claim exclusively under the federal constitution or that defendant waived that claim on state constitutional grounds. Our original opinion did not explicitly indicate whether it was grounded on the federal or state constitution, but it implicitly relied upon the Vermont Constitution. Nevertheless, because the opinion did not contain a plain statement of an adequate and independent state ground for the decision, the Supreme Court reviewed and reversed the case based on its own analysis of the facts and the federal constitution. See *Vermont v. Brillon,* 556 U.S. ___, ___, 129 S. Ct. 1283, 1287 (2009). On remand, we asked the parties to file briefs, not to exceed thirty pages, "on whether (1) this Court should find a speedy-trial violation under the Vermont Constitution, given the current state of the record; and (2) whether this Court should remand the matter to the district court for further factfinding to determine if there was a systematic breakdown in the public defender system that caused the

delay in this case." Now, after the parties have filed those briefs, we avoid the very questions we asked them to brief by stating that our original opinion was grounded solely on the federal constitution and that defendant waived his claim under the Vermont Constitution. Instead, we should clarify that our original opinion was in fact grounded on both the state and federal constitutions. Further, I would hold that the State's Attorney[8] has not presented us with any persuasive basis to alter our precedent under the Vermont Constitution. Accordingly, I dissent from this Court's refusal to uphold its previous dismissal of the charges against defendant. Given the Court's refusal to do so, however, I concur with the majority's determination that the trial court erred by denying defendant's request to bifurcate the aggravation element of the domestic assault charge.

¶ 32. Defendant sought dismissal of the charges against him in the district court based upon a violation of his right to a speedy trial under both the Vermont Constitution and the United States Constitution. On appeal to this Court, defendant reiterated that his lack-of-a-speedy-trial claim was grounded on both the state and federal constitutions, noting that this Court had adopted the federal *Barker* test in analyzing such claims under the Vermont Constitution. In our original opinion, we stated that "[b]oth the federal and Vermont constitutions guarantee defendants a right to a speedy trial," and acknowledged that this Court had "adopted" the federal *Barker* test to determine whether there had been a violation of the constitutional right to a speedy trial. *Brillon I*, 2008 VT 35, ¶¶ 11-12 (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972)).

¶ 33. In effect, like other state courts, we have accepted the basic balancing test set forth in *Barker*, but have reserved the right to interpret the *Barker* factors to best address the needs of our own court system and to ensure that defendants retain the full benefit of their state constitutional right to a speedy trial. Cf. *State v. Ariegwe*, 2007 MT 204, ¶ 35, 167 P.3d 815 (stating that while it was "guided by *Barker's* general approach for analyzing speedy trial claims," it could give its own meaning to *Barker*

---

[8] As in the first opinion, in this opinion I use the word "state" in lower case to refer to the combination of government entities that are responsible for administering the criminal justice system. See *State v. Brillon*, 2008 VT 35, ¶ 2 n.1, 183 Vt. 475, 955 A.2d 1108 [hereinafter *Brillon I*]. To avoid confusion, I use the term "State's Attorney" when referring to appellee.

factors under its state constitutional speedy-trial provision). Toward that end, in *Brillon* we cited and discussed several state court decisions concerning the second *Barker* factor, including decisions in which state courts had applied the *Barker* balancing test, but construed the factors under their state constitutions. See *Brillon*, 2008 VT 35, ¶¶ 18-19; cf. *Michigan v. Long*, 463 U.S. 1032, 1043-44 (1983) (in finding no independent state ground to support Michigan court's decision, Supreme Court noted that state court had relied exclusively on federal cases and its interpretation of federal law). In short, our opinion would have been exactly the same had only state constitutional grounds been raised, and thus the decision is our precedent under the Vermont Constitution, independent of its reliance on the United States Constitution.

¶ 34. Nevertheless, while we implied our reliance on the state constitution, we did not explicitly indicate, as at least one of the cases we cited did, that apart from any protection afforded by the federal constitution, our state constitution provided an adequate and independent ground for our decision. See *Middlebrook v. State*, 802 A.2d 268, 270 (Del. 2002) (explicitly stating that its speedy-trial decision was supported by either federal or state constitution). The result is that the United States Supreme Court reviewed our decision and rejected our analysis of the second *Barker* factor under the United States Constitution. See *State v. Badger*, 141 Vt. 430, 448, 450 A.2d 336, 347 (1982) (giving primacy to Vermont Constitution prevents Supreme Court from wasting "its scarce resources on illusory controversies").

¶ 35. Of course, the Supreme Court's reversal is controlling only to the extent of our reliance on the federal constitution. See *id.* at 448, 450 A.2d at 346 ("[I]f our ruling is based upon an adequate and independent state ground, federal review is limited to a determination of whether Vermont law violates some provision of federal law."). Accordingly, our opinion still stands on independent state constitutional grounds, and on remand we should rely upon those grounds to reinstate the opinion. See, e.g., *Commonwealth v. Labron*, 690 A.2d 228, 228-29 (Pa. 1997) (following reversal and remand by United States Supreme Court based on its conclusion that state court had not expressly grounded its holding on state constitution, Pennsylvania Supreme Court reaffirmed its original holding, explicitly stating that its prior order had been decided on state constitutional grounds); see also *People v. Ramos*, 689 P.2d 430, 432 (Cal. 1984) (en banc) (following reversal and remand from

United States Supreme Court based on Court's conclusion that jury instruction did not violate federal constitution, California Supreme Court held that instruction was "incompatible with state constitutional doctrine"); *People v. Harris*, 570 N.E.2d 1051, 1052-53 (N.Y. 1991) (following reversal and remand from United States Supreme Court based on its analysis of federal constitution, New York Court of Appeals held that state constitution required suppression of statements following illegal arrest); *People v. P.J. Video, Inc.*, 501 N.E.2d 556, 558 (N.Y. 1986) (following reversal and remand from United States Supreme Court based on its conclusion that there was no federal constitutional violation, New York Court of Appeals held that seizure of alleged obscene videotapes violated state constitution); *Pap's A.M. v. City of Erie*, 812 A.2d 591, 593 (Pa. 2002) (following reversal and remand by United States Supreme Court based on its conclusion that nudity ordinance did not violate federal constitution, Pennsylvania Supreme Court reinstated its prior order on state constitutional grounds); cf. *Van Arsdall v. State*, 524 A.2d 3, 4 (Del. 1987) (following reversal and remand from United States Supreme Court based on its determination that constitutional violation did not require automatic reversal, Delaware Supreme Court determined that error was not harmless under state law); *State v. Robinette*, 685 N.E.2d 762, 771 (Ohio 1997) (following reversal and remand from United States Supreme Court based on its determination that state court misapplied federal constitutional law, Ohio Supreme Court adopted federal analysis under state constitution).

¶ 36. I recognize that the Supreme Court has a unique perspective in establishing a national rule, but we are not bound by policies that are based on a national perspective. See *State v. Ludlow Supermarkets, Inc.*, 141 Vt. 261, 268, 448 A.2d 791, 795 (1982) (noting that while the United States Supreme Court disposes "of a case on the premise that its impact will presumably affect more than fifty varying jurisdictions, a state court reaches its result in the legal climate of the single jurisdiction with which it is associated"); *Pap's A.M.*, 812 A.2d at 608 (in reinstating its prior decision on state constitutional grounds following remand from United States Supreme Court, Pennsylvania Supreme Court noted that differences of opinion between federal and state courts "may be based in part on differing jurisprudential theories of the function and responsibilities of government, but they may be

based also on a regional, versus a national perspective") (quotation omitted). Indeed, it is entirely appropriate that we establish our own local rule for determining when there is a speedy-trial violation. Our constitution provides that this Court "shall have administrative control of all the courts of the state, and disciplinary authority concerning all judicial officers and attorneys at law in the State." Vt. Const. ch. II, § 30. In furtherance of this authority, this Court is empowered to make rules with respect to the provision of public defender services to indigent defendants. 13 V.S.A. § 5204. To that effect, this Court has promulgated an administrative order governing the assignment of counsel, the principal purpose of which is "to assure the availability of counsel to all persons adjudged in need thereof." Admin. Order No. 4, § 1.

¶ 37. With these responsibilities in mind, we held in *Brillon I* that when assigned counsel is unable or unwilling to move a criminal case forward over inordinate periods of time notwithstanding the defendant's repeated demands to be tried, the resulting delay must be counted, though not heavily, against the state under the second factor of the *Barker* balancing test that we have adopted in analyzing speedy-trial claims under the Vermont Constitution. 2008 VT 35, ¶¶ 2, 33, 35, 38. Following a detailed analysis of federal and state courts construing the second *Barker* factor, we arrived at this holding based on our desire to preserve the integrity of the state's criminal justice system and to ensure that every defendant, including indigent defendants, is provided the opportunity to obtain a speedy trial. *Id.* ¶¶ 18-19.

¶ 38. On remand from the Supreme Court, we asked the parties to brief whether this Court should find a speedy-trial violation under the Vermont Constitution, given the current state of the record, and whether this Court should remand the matter to the district court for further factfinding. For its part, the State's Attorney has responded by arguing that (1) the record establishes that defendant and his counsel were responsible for all of the delays in this case; and (2) the United States Supreme Court's opinion bars this Court from finding a speedy-trial violation under the Vermont Constitution.

¶ 39. We should reject both arguments, neither of which has any merit or is responsive to our entry order. In our original opinion, we stated that "the record does not support the State's suggestion" that defendant attempted "to manipulate the system by creating delay that could conceivably support later speedy-trial

claims." *Brillon I*, 2008 VT 35, ¶ 33. Indeed, notwithstanding the United States Supreme Court's reference to "defendant's deliberate attempt to disrupt proceedings," *Brillon*, 556 U.S. at ___, 129 S. Ct. at 1292, we concluded that, "[t]o the contrary, the record reveals that defendant consistently sought to be tried by competent counsel as quickly as possible." *Brillon I*, 2008 VT 35, ¶ 33. Nothing in the State's Attorney's revised statement of the facts suggests otherwise. See *Brillon I*, 2008 VT 35, ¶ 6 (noting that facts are "essentially undisputed" and concluding that remanding for post-conviction-relief-like hearing "would do nothing to further our resolution of the ultimate legal issue we must decide").[9]

¶ 40. Related to its first argument, the State's Attorney also suggests that we failed to take into account the effect that Brillon's early delay tactics had in causing the later delays. As noted, the record in this case does not demonstrate that Brillon ever deliberately sought to force the withdrawal of any of his attorneys in an effort to manipulate the system. In any event, we did not count against the state the earlier periods of time referenced by the State's Attorney, and we did take into account all of defendant's actions in reaching our overall determination that the second factor of the *Barker* test weighed against the state, though not heavily. Apparently, the State's Attorney would have this Court adopt a "but for" test that precludes counting any time period against the state if the circumstances occurring during that time period would not have arisen but for the defendant's previous actions. But an initial delay caused by a defendant cannot immunize the state against all later delays for which the state would otherwise be held responsible. In this case, the further delays and periods of time in which defendant had no representation were attributable to subsequent assigned counsel and miscommunication between the defender general and the court system. While these later delays may not have occurred but for earlier delays attributable to defendant, the later delays were independent and not the direct or proximate result of those earlier delays.

¶ 41. Nor is there any merit in the State's Attorney's second argument that the Supreme Court's decision forecloses us from

---

[9] In his dissent, Justice Burgess resurrects his version of the facts from his original dissenting opinion in *Brillon I*. I see no purpose in debating the facts in this opinion. The original opinion speaks for itself and stands as written.

reinstating our decision under the Vermont Constitution. The State's Attorney cites a particular passage in *Vermont v. Brillon* as holding that our decision, if allowed to stand, would violate the federal due process rights of indigent criminal defendants. In the passage, the Supreme Court postulated that our holding

> could encourage appointed counsel to delay proceedings by seeking unreasonable continuances, hoping thereby to obtain a dismissal of the indictment on speedy-trial grounds. Trial courts might well respond by viewing continuance requests made by appointed counsel with skepticism, concerned that even an apparently genuine need for more time is in reality a delay tactic. Yet the same considerations would not attend a privately retained counsel's requests for time extensions. We see no justification for treating defendants' speedy-trial claims differently based on whether their counsel is privately retained or publicly assigned.

556 U.S. at ___, 129 S. Ct. at 1292.

¶ 42. Plainly, this passage does not amount to a holding that our decision in *Brillon I* violates the federal due process rights of indigent defendants. Rather, the Court merely speculated that our holding could create a different dynamic in how courts address motions to continue depending on whether the motions came from assigned or retained counsel. This notion addresses the State's Attorney's contention that our holding will create a two-tiered criminal justice system in which motions to withdraw or continue will be scrutinized more carefully when defendants are represented by assigned counsel. The argument is both misdirected and overstated. In one sense, there is an inherent double standard. A defendant who can afford an attorney may choose the attorney. On the other hand, a defendant who cannot afford an attorney is not entitled to an attorney of choice, but rather must accept the counsel assigned by the court. See *State v. Ahearn*, 137 Vt. 253, 262, 403 A.2d 696, 703 (1979) ("An indigent defendant has no right to counsel of his own choosing."). For this reason, the considerations may not be identical when a trial court reviews a motion to withdraw in a case involving assigned, as opposed to retained, counsel. But, in the end, regardless of whether counsel is assigned or retained, the trial court has the responsibility of assuring, in reviewing a motion to withdraw or continue, that the requests are

reasonable and not an attempt to manipulate the system. In short, the standard for reviewing such motions does not differ in any significant way.

¶ 43. We held in our original opinion that delays caused by defense counsel, in rare circumstances, may be attributable to the state, not because the attorneys are assigned counsel, but rather because it is the responsibility of the state — the court system and the prosecution — to provide a prompt trial for defendants who are demanding their right to one. This is true irrespective of whether defense counsel is assigned or retained. I agree with the Supreme Court that assigned counsel are not state actors in the same sense as prosecutors representing the interests of the state in court, but when they fail to act on behalf of their clients, for institutional or other reasons, notwithstanding their clients' persistent pleas to be tried, and the trial court fails to intercede so as to afford defendants in such circumstances the speedy trial they demand, such delays should be attributable, though not heavily, to the state. Even the State conceded in its original brief that the institutional delays in this case that caused defendant to be without counsel for a period of months should be counted against the state.

¶ 44. I would reject the State's Attorney's argument that assigned counsel might be tempted to delay trial in the hopes of getting a client's criminal charges dismissed. We should not presume that assigned counsel will intentionally delay cases on the off-chance that their clients would be able to obtain a dismissal of charges based on a speedy-trial violation. First and foremost, we should not set policy or construe our constitution based on the presumption that members of the Vermont Bar will act unethically. In any event, even if assigned counsel were so inclined, such a strategy would not make sense. No matter how weak the potential defense, the likelihood of its success would far exceed any far-fetched attempt to manipulate the system to obtain a rare dismissal on speedy-trial grounds. See *State v. Keith*, 160 Vt. 257, 269-70, 628 A.2d 1247, 1255 (1993) (noting that speedy-trial violations are rare because "courts are reluctant to resort to the radical remedy of dismissal" when it means freeing someone who may have committed serious crime); see also *State v. Vargas*, 2009 VT 31, ¶¶ 10, 17, 185 Vt. 629, 971 A.2d 665 (mem.) (rejecting claim of speedy-trial violation because, unlike *Brillon I*, defendant did not repeatedly and adamantly demand speedy trial).

¶ 45. Further, if in fact our holding were to increase the trial courts' vigilance in scrutinizing motions to continue or withdraw to assure that defendants or their attorneys are not attempting to manipulate the system, so much the better. Trial courts should scrutinize motions to continue or withdraw before granting them, irrespective of whether defense counsel is assigned or retained. See V.R.Cr.P. 50(b)-(c) (establishing strict criteria for granting continuances); V.R.Cr.P. 44.2(c) (providing that motions for withdrawal of counsel following initial status conference or more than twenty-eight days after arraignment may be granted only "for good cause shown and on such terms as the court may order"). If a defendant is demanding a speedy trial, defense counsel should be given no more than a reasonable amount of time to prepare for trial so as to protect the rights and interests of both the accused and society. See *Barker*, 407 U.S. at 521, 521 n.15 (stating that courts considering motions for continuance should be guided by principle that trials must be "swift but deliberate," and further noting that "requirement of unreasonable speed would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself"). By the same token, when a defendant demands a new assigned counsel, the trial court should scrutinize the demand to determine whether it is legitimate and has an adequate basis. As we stated in *Brillon I*, "it is ultimately the trial court's responsibility to control the proceedings by denying new counsel or continuances if it believes that the defendant is attempting to manipulate the system." 2008 VT 35, ¶ 5.

¶ 46. For all these reasons, we should reinstate our original opinion on independent state constitutional grounds insofar as that is what we intended in the opinion and none of the policy concerns raised by the State's Attorney demonstrate that the opinion was in error or ill-advised. I recognize that the brief language in the federal and state constitutions granting the right to a speedy trial does not differ in any significant way. Compare U.S. Const. amend. VI (stating that in "criminal prosecutions, the accused shall enjoy the right to a speedy and public trial"), with Vt. Const. ch. I, art. 10 (stating that "in all prosecutions for criminal offenses, a person hath a right to . . . a speedy public trial"). But the similarity in language in the two constitutions does not preclude us from exercising our authority and responsibility to construe the Vermont constitution. See *Ramos*, 689 P.2d at 439

(stating, on remand from United States Supreme Court, that state courts cannot relegate their responsibility for resolving state law to guardians of federal law, and thus are not confined to Supreme Court's interpretation of similar provision in federal constitution). Indeed, we have diverged from the United States Supreme Court on numerous occasions even when the language in the federal and state constitutions did not vary to any significant degree. See, e.g., *State v. Sprague*, 2003 VT 20, ¶¶ 13-20, 175 Vt. 123, 824 A.2d 539 (rejecting under Article 11 of Vermont Constitution United States Supreme Court's holding that police officers may order motorists out of their vehicles without any particularized suspicion of criminal activity or danger); *State v. Morris*, 165 Vt. 111, 126-27, 680 A.2d 90, 101 (1996) (declining to follow United States Supreme Court's holding that police may make warrantless search of trash left out for pickup, and citing other occasions in which this Court has taken path different from Supreme Court). That is the course we should take in this case.

¶ 47. **Dooley, J.,** concurring. I agree with Justice Skoglund that defendant's conviction should not be reversed for violation of his right to a speedy public trial under Chapter I, Article 10 of the Vermont Constitution, albeit on other grounds. I join in her opinion that the failure to bifurcate the trial was error and was not harmless error. Therefore, I join in the judgment.

¶ 48. As Justice Johnson correctly points out, (1) defendant claimed deprivation of a speedy trial under both the federal and Vermont Constitution; (2) our original decision was at least implicitly based upon both the Sixth Amendment to the United States Constitution *and* Chapter I, Article 10 of the Vermont Constitution; and (3) we can and should decide whether the latter violation still requires that defendant's conviction be reversed for failure of the state to provide him a speedy public trial. *Ante*, ¶¶ 32-35. I also agree with Justice Johnson that under the unique facts of this case the failure of the public defender system to provide defendant counsel and the failure of assigned counsel to move the case forward caused a violation of Article 10 for which the state was responsible. In this respect, I concur in her analysis that defendant was denied a speedy trial under the Vermont Constitution. In interpreting Article 10, we should make clear that we reject the United States Supreme Court's analysis of the Sixth Amendment that delay caused by appointed counsel is always charged to the defendant on a speedy-trial claim.

¶ 49. My points of agreement with Justice Johnson do not fully answer whether defendant's conviction should be reversed because the United States Supreme Court rejected our decision on a second ground. The Court held that "the Vermont Supreme Court failed appropriately to take into account Brillon's role during the first year of delay," that "a defendant's deliberate attempt to disrupt proceedings [must] be weighted heavily against the defendant," and that "[a]bsent Brillon's deliberate efforts to force the withdrawal of [his first and third appointed lawyers], no speedy-trial issue would have arisen." *Vermont v. Brillon*, 556 U.S. ___, ___, 129 S. Ct. 1283, 1292 (2009). As a result, the Court found that "the three year-delay [was] caused mostly by Brillon" and "[i]n light of his own role in the initial periods of delay, . . . [the six-month period of no representation], even if attributed to the State, does not establish a speedy-trial violation." *Id.* at ___ nn.8-9, 129 S. Ct. at 1292 nn.8-9.

¶ 50. At one level, this case has been about the proper responsibility for bringing a criminal case to trial within a reasonable period of time; at another level, the issue is whether defendant is a master manipulator who had lawyers disqualified in order to prevent trial and create a speedy-trial claim. A complete reading of the separate opinions in the first decision from this Court shows that for the majority the case was about the first level; for the dissent it was entirely about the second level. The briefing in this Court on remand from the United States Supreme Court mirrors the original divide. The defendant argues the policy questions; the state's attorney ignores the policy questions and argues that but for defendant's improper manipulation he would have had a speedy trial.

¶ 51. The majority of the United States Supreme Court sided with the dissenting members of this Court and the position of the state's attorney. Indeed, it went even further. Where Justice Burgess argued for a remand and complained that the majority was engaging in appellate fact-finding, *State v. Brillon*, 2008 VT 35, ¶¶ 57, 82, 183 Vt. 475, 955 A.2d 1108, the United States Supreme Court clearly engaged in appellate fact-finding, drawing conclusions from its fact-finding and engaging in analysis contrary to that of the majority of this Court. I agree with Justice Breyer in his dissent that this Court did not make "the error of constitutional law that the majority attributes to it." *Vermont v. Brillon*, 556 U.S. at ___, 129 S. Ct. at 1294. Rather, the United

States Supreme Court grounds its reversal of our decision on an error of fact, of fact and law, or of factual analysis.

¶ 52. Justice Johnson has cited numerous cases from other states where the state's highest court, on remand from the United States Supreme Court, reinstated its judgment based on its own constitutional provisions. Each case involved important issues of constitutional law defining the rights of citizens against the state, with important ramifications for future controversies. In the end, this case turns on none of that — the question is only whether this defendant disrupted his trial to delay it and create a speedy-trial violation. This is hardly a question of constitutional law on which we can make an independent judgment based on our analysis of the constitutional text.

¶ 53. As much as I disagree with it and believe it is outside the proper role of the United States Supreme Court, I conclude that we must accept the appellate fact-finding of that Court just as the lower courts in this state must accept our judgment even if we step over the line and get too far into the facts in deciding an appeal. Indeed, had I concluded that defendant arranged for the dismissal of lawyers for the purpose of creating a speedy-trial claim, rather than to achieve adequate representation, I would agree that he has waived his speedy-trial claim. For this reason, I concur in the judgment that defendant's conviction be affirmed with respect to the speedy-trial claim under Chapter I, Article 10 of the Vermont Constitution.

¶ 54. **Reiber, C.J.,** concurring in Part I, and dissenting in Part II. This appeal has traveled a long road, from here to the United States Supreme Court and back again, raising novel claims of constitutional significance. The few that now remain, although more conventional in nature, warrant the same care and consideration. I am persuaded, however, that the majority has erred in concluding for a second time that the judgment must be reversed, this time on the ground that the trial court refused to separate the trial of the domestic assault charge from the underlying aggravating element based on the violation of a court-ordered condition-of-release.

¶ 55. I do not disagree with the holding in Part I of the majority opinion that the state constitutional-law claim was not preserved for review on appeal. Nor do I dispute the majority's initial conclusion in Part II of the opinion that bifurcation is not

necessarily confined to the trial of prior convictions.[10] Even assuming that the trial court erred in concluding otherwise, however, it is axiomatic that reversal is not required absent any prejudicial affect on the verdict. The majority recognizes this principle, but fails to apply it. Accordingly, I respectfully dissent.

¶ 56. "The two most important factors in the harm equation we must employ are the strength of the prosecution's case without the offending evidence and the strength of the offending evidence." *State v. Lipka*, 174 Vt. 377, 385, 817 A.2d 27, 33-34 (2002). The majority here only cursorily considers the second factor — the strength of the offending evidence — and addresses the first — the strength of the State's case — barely at all. When these two factors are adequately addressed, however, it becomes clear that any possible error resulting from the failure to bifurcate in this case was harmless beyond a reasonable doubt.

¶ 57. As for the "offending evidence," it is important to understand that, once the trial court denied the motion to bifurcate, defendant entered into a stipulation with the State precisely for the purpose of minimizing any potential prejudice.[11] That stipulation, which the court read to the jury, provided that "[t]he parties hereby stipulate and agree that . . . the condition of release that defendant shall not harass, or cause to be harassed [the victim] was validly imposed by the Court on July 9, 2001, and remained in place as of July 27, 2001." The stipulation further provided that "the parties agreed that the State need not present any additional evidence to establish the validity of these conditions." Apart from this statement and several brief references in the State's opening

---

[10] That said, I would underscore the majority's recognition that bifurcation is generally *not* required where the aggravating factor is "factually intertwined with the underlying offense," including the many crimes where it "is based on characteristics of the crime itself such as the type of harm caused, the identity of the victim, or the use of a weapon." *Ante*, ¶ 26. It is the rare case where the aggravating element poses the prejudicial potential akin to a prior conviction, i.e., where it might unfairly suggest a predisposition to commit the crime charged. *State v. Moran*, 141 Vt. 10, 19, 444 A.2d 879, 883 (1982). Indeed, standing alone, evidence that the defendant violated a court order designed to protect the victim — as charged in this case — would generally not in my view raise concerns sufficient to bifurcate the issue. There may be cases where prudence strongly dictates exclusion of the facts underlying the court order, and where their admission would prove unduly prejudicial, but as discussed below this was not such a case.

[11] The trial court originally denied defendant's request to stipulate to the existence of the court order, but subsequently accepted it.

and closing argument, the prior court order received no additional attention during the trial.

¶ 58. While there is no doubt, therefore, that the jury was informed of the existence of the nonharassment order, the issue here is whether this information constituted the sort of prior "bad act" evidence that we have found to be so powerfully prejudicial because of its potential to create "an entirely different . . . calculus of probabilities in deciding whether to convict." *Lipka*, 174 Vt. at 388, 817 A.2d at 36 (quotations omitted). Certainly the nonharassment order implied some past conflict between defendant and the victim sufficient to warrant court intervention, but standing alone and bereft of telling detail it did not, I submit, pose the grave danger of prejudice that we have found in other cases where potentially inflammatory evidence of prior offenses by the defendant was erroneously admitted. Cf. *Lipka*, 174 Vt. at 388, 817 A.2d at 36 (evidence of defendant's prior sexual misconduct against his own daughter was "particularly explosive and prejudicial"); *State v. McCarthy*, 156 Vt. 148, 154-55, 589 A.2d 869, 873-74 (1991) (holding that the "admission of extensive details of defendant's alleged prior misconduct" of sexual assaults constituted plain error).

¶ 59. As for the actual incident that gave rise to the court order, here again the evidence was minimal and far from inflammatory. Indeed, the jury heard reference to the matter on only three brief occasions during the course of a three-day trial. The first occurred during the victim's testimony, when she recalled an incident in June 2000, a year before the charged offense, when she went outside after an argument with defendant and found her tires slashed. She did not mention it again. The second occurred during the State's closing argument, when the prosecutor noted that the nonharassment order had been "imposed as a result of another incident involving [the victim] where [defendant] had been charged with slashing her tires."

¶ 60. The final reference occurred during the State's rebuttal argument. In response to defense counsel's observation that defendant had never previously struck the victim, the prosecutor recalled that defendant had "threatened her before; that he slashed her tires; that she's been scared of him." Counsel immediately objected on the ground that the State was attempting "to argue that that evidence of the slashing tires means that he hit [the victim]." During the ensuing bench conference, the prosecutor

denied that this was either the intent or the effect of her argument, prompting the court to propose that the prosecutor "just make it clear that that doesn't mean that he assaulted her when he slashed her tires." The prosecutor readily assented, and proceeded with her argument as follows:

> [O]ne clarification. The fact that [defendant] slashed the tires before is not evidence upon which you can find the fact that he struck her here, okay? The fact that he had done that before in and of itself is not evidence of guilt beyond a reasonable doubt in this case. It's not evidence at all that he struck her here.

¶ 61. Thus, the jury was specifically informed that it was not to consider the tire incident as evidence that defendant committed the domestic assault. Although it was the prosecutor rather than the court delivering the instruction, it followed a defense objection and a bench conference and thus carried the court's stamp of approval. Furthermore, the trial court itself cautioned the jury on the *same* subject, subsequently charging as follows: "Evidence has been introduced in this case concerning allegations of other incidents between the Defendant and [the victim]. You should distinctly understand that the Defendant is not on trial for any actions other than the charged offenses." Any potential prejudice from the tire incident, therefore, was promptly mitigated by instructions to the jury that the incident was not to be considered in determining defendant's guilt or innocence on the domestic assault charge. See *State v. Mears*, 170 Vt. 336, 346, 749 A.2d 600, 607 (2000) (an immediate and unequivocal instruction may cure any potential prejudice).

¶ 62. Balanced against the rather limited likelihood of prejudice was the overwhelmingly one-sided and uniform evidence of defendant's guilt. Although overlooked by the majority, the evidence was indeed compelling. The victim testified at length concerning the incident that led to the assault, providing substantial detail about the surrounding events, including defendant's highly intoxicated condition, his angry and confrontational behavior, her decision to leave the trailer with her baby and drive away to safety, and defendant's response in which he pulled open the driver's side door and punched her in the face. Multiple additional witnesses provided corroborating detail. The victim's sister, who was present during the incident, recounted many of the same facts concerning

the confrontation, saw the victim leave the trailer, heard the car start, watched as defendant ran out after her, and went to the door to see what would happen. She saw the car stop, saw the driver's door open and defendant lunge inside, and heard the impact of the blow to the victim's head.

¶ 63. The victim's neighbor recalled a woman, later identified as the victim's sister, pounding on her door in an excited condition reporting that "he's beating up my sister" and asking her to call the police. The neighbor described the victim, who arrived shortly thereafter, as "crying, hysterical, and her mouth was bleeding" and recalled her saying that defendant "had hit her." The tape of the neighbor's 911 call to the police contains the victim's voice stating that defendant had punched her in the face. The investigating officers who arrived at the scene described the victim as emotionally upset, and noted a swelling and bruising on her face and blood coming from the corner of her mouth. She told them that defendant had struck her. Another officer described finding defendant lying down in a woods near the trailer in a highly intoxicated state. The officer recalled that defendant was extremely insulting and abusive, vomited, and ultimately passed out at the station. Defendant called no witnesses, but merely argued that inconsistencies in the victim's testimony undermined her credibility, and suggested that defendant had acted in self-defense, recalling the victim's testimony that she had armed herself with a baseball bat during the confrontation in the trailer.

¶ 64. The question in determining harmless error is whether the jury would have reached the same result without the offending evidence. *Lipka*, 174 Vt. at 384, 817 A.2d at 33-34. The record here, summarized above, leaves no doubt that it would. The evidence of guilt was not close, and there is no reasonable basis to conclude that the tire-slashing incident that led to the nonharassment order tipped the balance against defendant or unfairly predisposed the jury to find guilt where it otherwise would not have. We may confidently conclude, on the basis of the record as a whole, that any error was harmless, and the verdict would have been the same without any reference to the nonharassment order or the alleged prior misconduct.[12]

¶ 65. Defendant's remaining claims require no extended discussion. He contends the trial court violated Vermont Rule of

---

[12] For similar reasons, the record does not support defendant's corollary claim that he was unduly prejudiced by the court's factually accurate instruction that

Evidence 608(b) in ruling that, if defendant testified, the State could cross-examine him as to whether he had lied on the stand in a prior unrelated criminal prosecution. Although defendant objected to the ruling below, he did not raise this specific claim, and therefore has waived it for purposes of appeal. See *State v Brink*, 2008 VT 33, ¶ 6, 183 Vt. 603, 949 A.2d 1069 (mem.) ("To properly preserve an issue for appeal a party must present the issue with specificity and clarity in a manner which gives the trial court a fair opportunity to rule on it." (quotation omitted)).

¶ 66. Defendant lastly asserts that the trial court erred in denying a motion to withdraw his waiver of jury trial on the prior convictions underlying the habitual offender enhancement. The record shows that defendant affirmatively requested the waiver while the jury was deliberating the domestic assault charge, and that the court engaged in a full colloquy with defendant to ensure that the waiver was knowing and voluntary. Following the verdict, the court scheduled a trial on the habitual-offender charge. Two days before the scheduled trial, however, defendant moved to withdraw his jury waiver on the ground that a jury trial was compelled by the intervening United States Supreme Court decision in *Blakely v. Washington*, 542 U.S. 296 (2004). The court denied the motion, observing that defendant had entered into a valid waiver and that *Blakely* had "create[d] no additional right or remedy."

¶ 67. We have held that "in order to withdraw a valid jury trial waiver, a defendant bears the burden of showing that the withdrawal is requested in good faith, and that granting the request would not prejudice the State, unduly delay the trial, impede the administration of justice, or significantly inconvenience the witnesses." *State v. Sweeney*, 2005 VT 11, ¶ 10, 178 Vt. 1, 869 A.2d 137. Defendant's request here failed to meet this burden. The trial court correctly ruled that the basis for the motion was entirely groundless; *Blakely* merely applied and extended the holding in *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), which recognized a defendant's right to jury trial on any fact "[o]ther than the fact of a prior conviction" that increases the penalty for a crime beyond the prescribed statutory minimum. *Blakely* plainly had no bearing on defendant's earlier waiver. Furthermore, de-

conditions of release are imposed for the limited purposes of ensuring the defendant's appearance and protecting the public or a particular individual.

fendant's motion merely asserted, without more, that withdrawal of the waiver would present "no prejudice to the State." This was insufficient to satisfy *Sweeney*'s requirement of an affirmative showing that withdrawal would pose no prejudice or inconvenience to the State, the witnesses, or the administration of justice. Accordingly, there was no error.

¶ 68. For all of the foregoing reasons, I would affirm the judgment. I am authorized to state that Justice Burgess joins in this dissent.

¶ 69. **Burgess, J.,** concurring in Part I, and dissenting in Part II. Having joined in the Chief Justice's dissent, I write separately to respond to a few points asserted by my other colleagues in their dissenting and concurring opinions. It is settled that delay by assigned defense counsel is not attributable to the state for purposes of claiming a speedy-trial violation under the federal constitution, *Vermont v. Brillon*, 556 U.S. ___, ___, 129 S. Ct. 1283, 1291 (2009), and the opposite holding of *State v. Brillon*, 2008 VT 35, ¶ 2, 183 Vt. 475, 955 A.2d 1108 [hereinafter *Brillon I*], which is reversed and in the past. Nevertheless, deep differences in that split opinion reemerge today in certain characterizations regarding whether the same case presents a speedy-trial violation under the state constitution. Given that facts assumed or arrived at by the majority in *Brillon I* were important enough to reiterate here, it is equally important to correct any misimpressions left by those recitations.

¶ 70. Assuming defendant acted in good faith without intending to sabotage efforts to secure him a trial in this case, nothing in the undisputed record supports a claim of denial of speedy trial under Chapter I, Article 10 of the Vermont Constitution. The record is that early on defendant was twice assigned counsel and scheduled for trial. It is undisputed that the trial court rejected defendant's claims that counsel was unprepared or too overworked to proceed to trial, and those rulings are not challenged on appeal. It is uncontested that, rather than go to trial, defendant took steps to disqualify his first counsel and later, after failing to show his second counsel ineffective, disqualified his second counsel on the eve of trial by threatening him. It is undisputed that defendant then, after warnings by the trial court, expressly waived his right to speedy trial.

¶ 71. Having his speedy-trial right twice satisfied, defendant never demanded speedy trial thereafter. However, an earlier

impression from *Brillon I* that defendant repeatedly demanded trial is restated here by Justice Johnson, *ante*, ¶ 37, and is apparently shared by Justice Dooley, *ante*, ¶ 48. The undisputed record demonstrates the contrary. As in *Brillon I*, the trial court's findings and conclusion that defendant often sought dismissal, but never demanded speedy trial, despite the court's explicit willingness to accommodate such a demand, remains unchallenged in the instant appeal.

¶ 72. To be sure, the same record shows there followed a fourteen-month delay when defendant was assigned ineffective counsel, or no counsel, due to conflict and contracting problems at the Defender General's office. But even on the theory of state responsibility for public defender nonfeasance promoted by Justices Johnson and Dooley (rejected by the U.S. Supreme Court for federal speedy-trial purposes), such delay would still not be a violation of Vermont's constitutional right to speedy trial without necessary *Barker* findings as to length and cause of delay, assertion of right and prejudice. See *Brillon I*, 2008 VT 35, ¶¶ 11-12 (confirming our adoption of the factors announced in *Barker v. Wingo*, 407 U.S. 514 (1972), for determining violation of speedy trial). Except for defendant's choice not to go to trial in the first two instances, and his waiver, there would have been no delay. Assuming, as does Justice Johnson, an independent superseding delay afterwards, *ante*, ¶ 40, defendant failed to assert any demand for trial. Nothing in the record shows any actual prejudice resulting from delay. If prejudice is presumed, the state's attorney was not afforded its due opportunity for rebuttal. See *Doggett v. United States*, 505 U.S. 647, 657-58 (1992) (holding that presumptive prejudice from extraordinary trial delay is not conclusive, but rebuttable). As in *Brillon I*, the *Barker* criteria are not proven in defendant's favor. Contrary to the view of Justice Johnson, there is no basis here to "reinstate our original opinion on independent state constitutional grounds." *Ante*, ¶ 46.

¶ 73. I dissent and am authorized to state that Chief Justice Reiber joins in this dissent.